# The State ex rel. Robertson v. Mc-Gough.

| 118 | 159 |
| 130 | 163 |
| 118 | 159 |
| e132 | 243 |
| 118 | 159 |
| 140 | 499 |
| 118 | 159 |
| 142 | 648 |

### Proceedings in the Nature of Quo Warranto.

1. *Constitutional law; act to provide for inspection of oils unconstitutional and void.*—An inspector of oils appointed by the State auditor under the provisions of the act "to provide for the inspection and sale of illuminating oils in the State of Alabama," approved February 16th, 1897, (Acts of 1896-97, p. 1133), deriving his authority from the State, and the duties pertaining to the office being of a public character, is a State office; and, therefore, said act is unconstitutional and void, as being repugnant to section 38 of Article IV of the Constitution, which provides that "No State office shall be continued or created for the inspection or measuring of any merchandise, manufacture or commodity." (BRICKELL, C. J., *dissenting.*)

APPEAL from the Circuit Court of Montgomery.
Tried before the Hon. JOHN R. TYSON.

This was a proceeding in the nature of *quo warranto*, and was commenced by the filing of an information by the State of Alabama on the relation of W. T. Robertson against the appellee, Thomas D. McGough. In this information it was alleged that Thomas D. McGough, a resident citizen of Montgomery county, State of Alabama, was unlawfully holding and exercising the duties of the office of district inspector of oil; that on divers occasions during the month of March, 1897, said McGough had claimed and exercised and was claiming and exercising the right as district inspector of oil in the said State and county aforesaid, to test the quality of all mineral or petroleum oils, or any oil which is the product of petroleum, which is offered or intended for sale for illuminating purposes, and for such services had demanded and received a compensation; that the sole authority upon which the said McGough held or exercised or performed the functions of the office of district inspector of oil was derived under an appointment of the State Auditor, who claimed the right to make such appointment, under the provisions of "An act to provide for the inspection and sale of illuminating oils in Alabama," approved February 16, 1897. It was then averred in the information that said act had not conferred any authority upon the auditor to appoint any one district inspector of oil, and that said McGough by virtue of his appointment was not entitled to hold said office, and had no authority to inspect any oil or to demand or receive any compensation for such inspection, or to exercise any of the authorities, privileges, franchises or duties attempted to be conferred by said act; and that said McGough is guilty of usurping the office of district inspector of oil, since said act was violative of section 38 of Article IV of the Constitution of Alabama.

The prayer of the information was for the issuance of a rule or other appropriate writ to McGough requiring him to show by what warrant he exercised and enjoyed the duties and privileges of the office of district inspector of oil, and that on final hearing the court should adjudge that said McGough was usurping and intruding in said office, and that judgment be rendered excluding said McGough from said office of dis-

trict inspector of oil. This information was filed on April 19, 1897.

To this information the respondent demurred upon the following grounds: "1st. That it appears in and by the said information that he is rightfully exercising the duties and powers of the said office of district inspector of oil.

"2d. That it appears in any by the said information, that his authority and right to exercise and hold the said office of district inspector of oil is derived by appointment from the State Auditor under the provisions of 'An act to provide for the inspection and sale of illuminating oils in the State of Alabama,' approved February 16th, 1897."

The court sustained this demurrer, and rendered judgment holding that said Thomas D. McGough was authorized to exercise the rights, privileges and duties of district inspector of oil, and dismissed said petition and information. To the rendition of this judgment the relator duly excepted; and upon this appeal, prosecuted by him, assigns the rendition thereof as error.

THOS. G. & CHAS. P. JONES and A. C. BIRCH, for appellant.—Oil inspectors created under the act approved February 16, 1897, (Acts of 1896-97, p. 1133), are State officers, and said act creates said offices. Such officers come up to the full measure of the definition of the State officer, both to the letter and spirit of the Constitution.—*Montgomery's Case,* 107 Ala. 379; *Shelby v. Alcorn,* 36 Miss. 273; *People v. Nostrand,* 46 N. Y. 381; *U. S. v. Hartwell,* 6 Wall. 393; *U. S. v. Morris,* 3 Brock. 102; 19 Amer. & Eng. Encyc. of Law, 382; Meachem Public Officers, §§4, 5, 7, 8, 10; *Bradford v. Justices,* 33 Ga. 332; *Kirksey v. Bates,* 7 Port. 529. They are State officers strictly, in every respect.—*Birch v. Hardwicke,* 30 Gratt. 24; *State v. Porter,* 1 Ala. 706; *State v. Valle,* 41 Mo. 31; 1 Dillon Municipal Corporations, §58.

The statute under consideration is, therefore, repugnant to and violative of section 38 of Article IV of the Constitution. The language of said clause of the Constitution is plain and unambiguous, and in nowise controlled or explained by any other provision in the Con-

[The State *ex rel.* Robertson v. McGough.]

stitution. When the "terms of an act are plain and unambiguous, they must be so expounded and executed, wholly regardless of the court's views as to inconvenience or absurdity which may result from giving effect to it according to its terms."—*Abbey v. Hill*, 73 E. C. & L. Rep. 390; *Douglass v. Freeholders*, 38 N. J. L. 214; *Clark v. R. R. Co.*, 81 Me. 477; *Bartlett v. Morris*, 9 Port. 266; Sedgwick on Constitutional Construction, pp. 251-261; Cooley Con. Lim. 71.

Section 38 of Article IV of the Constitution intended not only to guard against evils developed by past inspection laws of State officers, but to prevent any new form of the evil. The design was to put an end to the whole system of "inspection," when State officers were created to make them; because such "inspection," sooner or later, causes solicitation of legislative power to create State officers, and hatches out swarms of officers to vex the people and devour their substance; and the system of State inspection having these results, the "evil" from the creation of State officers was the same, whether the inspection proceeded on the grounds of securing human safety, or was alleged to be in furtherance of trade and commerce, or any other purposes for which the police power is ordinarily employed.

The purpose of a statute and its constitutionality in whatever language it may be framed, must be determined by its natural and reasonable effect.—*Henderson v. Mayer*, 92 U. S. 259; *Chy Lung v. Freeman, Ib.* 275. It is also a settled canon of constitutional law that the legislative power by declaring a commodity dangerous, can not make it so, if the declaration is not true in point of fact, in order to exercise powers with reference to it, which can not be upheld if the thing in fact is not dangerous.—*Joseph v. Randolph*, 71 Ala. 499; *People v. Marx*, 99 N. Y. 377; Tiedeman's Limitations of Police Powers, p. 119.

These are matters of fact, which the courts must determine for themselves. They are judicial, and not legislative questions, in their last analysis.—Tiedeman's Lim. of Police Powers, 497; *Joseph v. Randolph*, 71 Ala. 499; *People v. Marx*, 99 N. Y. 377; *Yares v. Milwaukee*, 10 Wall. 497; *City Council v. Hutchison*, 13

Ala. 576; Wood on Nuisances, §§151, 740; *Rye v. Peterson,* 23 Amer. Rep. 608.

HORACE STRINGFELLOW and TOMPKINS & TROY, *contra.*—A legislative act is to be interpreted according to the intention of the legislature apparent upon its face. So the purpose and constitutionality of a statute in whatever language it may be framed must be determined by its reasonable and natural effect.—*Joseph v. Randolph,* 71 Ala. 506; *Mayor of Mobile v. Stonewall,* 53 Ala. 577. The act "is in the best sense a mere police regulation deemed essential for the protection of the lives and property of citizens. It expresses in the most solemn form the deliberate judgment of the State, that burning fluids which ignite or permanently burn at less than a prescribed temperature, are unsafe for illuminating purposes."—*Patterson v. Kentucky,* 97 U. S. 504.

It is strictly within the enforcement of the legal maxim *"sic utere tuo ut alienum non laedas."* "In every well ordered State property is held subject to the tacit condition that it shall not be used so as to injure the equal rights of others, or the interests of the community. Such injurious uses of property may be prevented by such regulations and restraints as the legislature may think proper to impose, and in the establishment of these, the only limits to the legislative authority, are those which are declared in the written and fundamental law."—*Ingram v. The State,* 39 Ala. 249; *Dorman v. The State,* 34 Ala. 245.

The provision of the Constitution involved in this case appears for the first time in our present Constitution. When interpreted by its history, by the causes that led to its adoption, and by the mischief it was intended to remedy it in no way conflicts with the creation of an office for such inspection by the State;

(*a.*) Because it referred solely to the enforcement by the State of a well defined and distinct class of laws, known as inspection laws whose purpose was to protect the public from fraud and to preserve the character of the merchandise abroad.

(*b.*) Because such distinct and well defined system of laws had been enforced by the State from which pub-

lic mischief had resulted·; causing the abandonment of said State system and the relegation by legislation of the entire subject of such inspection laws to the local authorities, and section·38 was but ·the ·perpetuation of such policy.

(*c.*) Because no inspection by·the State· for·the enforcement of its police regulation for·the protection of life and property had·existed; and hence no· public mischief had resulted from such inspection to be remedied.

(*d.*) Because the· protection of life and' property as declared by the Constitution is the legitimate end of government, and no provision should be held to impair the power of the State to afford such protection if it can have·any other reasonable operation, for such result could not have been intended by the people.

"In pronouncing ọṇ the constitutionality of an · act of the legislature the court necessarily passes on the legality of an act which has received the sanction · of a co-ordinate department of the government. Hence the courts approach such inquiry with a due sense· of its magnitude and solemnity, ·and indulge the presumption that the enactment in question is constitutional until ·clearly convinced to ·the contrary."—*Zeigler v. S. & N. Ala. R. R. Co.*, 58 Ala. 596; *Mayor of Mobile v. Stonewall,* 53 Ala. 375.

HARALSON, J.—The Constitution; Art. IV, §38, declares: "No State office shall be continued or created for the inspection or measuring of any merchandise, manufacture or commodity; but any county or municipality may appoint such officers when authorized by law."

The sole question presented in this case is, whether or not the act, "To provide ·for the inspection and sale of illuminating oils in the State of Alabama," adopted February 16, 1897, (Acts of 1896-97, p. 1133), is in con-· flict with the foregoing constitutional provision.

Under this statute, the State is' the source of the inspector's authority; the ·duties pertaining to the office are of a public character; the terms of office are four years from the date of their respective appointments, and until their respective ·successors ·shall be appointed and qualified—(§9); and their compensation is fixed

by law.   It is not here contended, and could not be, that these inspectors, under these conditions, are not State officers.—*Montgomery v. The State,* 107 Ala. .372, and authorities there .cited.

It will be observed that the section of the Constitution to be construed in connection with said act, was not intended to prohibit, and does not prohibit, "the inspection or measuring of any merchandise, manufacture or commodity."   Whatever authority the legislature had, prior to the adoption of the Constitution of 1875, in respect to such inspections, it now has, with the limitation only of the manner of its exercise.   Theretofore, it had plenary power over the subject, since there was nothing in the Constitution of. the State to limit its exercise.   The only restriction laid upon this power under the present Constitution is, that "no State office shall be continued or created" for such purposes. The other provision, "but any county or municipality may appoint such officers [or officers for such purposes] when authorized by law," imposes no new limitation of authority on the legislature.   It had, and exercised this authority under the older constitutions of the State, before the adoption of the one of 1875.   The exception in this clause of said section is important, as contended, as indicating an intention on the part of the framers of the Constitution to limit any and all inspections authorized to be made of merchandise, to county and municipal authorities.

Section one of said act of February 16, 1897, and its remaining sections, place it beyond all dispute, that said act relates alone to oils, whether manufactured in this State, or imported therein, which are offered for sale, or sold "for consumption for illuminating purposes."   The manner of testing—for really the inspection consists in a scientific test, to determine at what degree of temperature, Fahrenheit, the. oils will ignite or burn,—is particularly prescribed in said section, followed by the provision that "No oil, or other substance, which by test herein described, ignites and burns at any temperature below one hundred and ten degrees, Fahrenheit, shall be allowed to be sold, offered for sale, or consumed for illuminating purposes in this State."

The question arises, then, whether this act of the leg-

islature falls under the condemnation of said section of the Constitution, providing that "No State office shall be continued or created for the inspection of any merchandise, manufacture or commodity."

It is to be admitted broadly, that the object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it; that their intent is deduced, not only from the language of the particular provision to be construed, but in connection with all the other parts of the instrument; from its history, and from a consideration of the causes which led to its adoption, and the mischief it was intended to remedy.—Cooley on Const. Lim., 69, 70, 80; 1 Story on the Const., §405; *Mayor v. Stonewall Ins. Co.*, 53 Ala. 570; *Taylor v. Woods*, 52 Ala. 477; *Zeigler v. R. R. Co.*, 58 Ala. 218.

But, there are other rules of interpretation that may override all others, as "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature (or framers of a constitution) should be intended to mean what they have plainly expressed, and consequently no room is left for construction. Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere."—Cooley on Const. Lim., 69, 70. The framers of the Constitution "must be understood to have employed words in their natural sense, and to have intended what they said." *Ib*, 73; *Gibbons v. Ogden*, 9 Wheat. 188; *Ex parte Mayor*, 78 Ala. 423. "We can only learn what they intended, from what they have said. It is theirs to command, ours to obey. When their language is plain, no discretion is left to us. We have no right to stray into the mazes of conjecture, or to search for an imaginary purposes."—*Lehman v. Robinson*, 59 Ala. 241.

Whenever a constitutional provision is plain and unambiguous, when no two meanings can be placed on the words employed, it is mandatory, and courts are bound to obey it. Such a mandate, whether wise or unwise, whether founded upon good reasons or not, is obligatory, and cannot be construed away by the history of the past, or by any mischief that it may be supposed it was intended to remedy. If it should run counter to

well accepted theories as to the police power of the State, that can make no difference, since the Constitution can set aside all legislative police powers, and ordain the powers to be exercised or not exercised in this regard by the legislature; and what it ordains must stand as its own unquestioned arbitrary authority in the government of the State. In such a case, as has been said, there is no room for construction, and certainly none for disobedience by the courts. If so, there would remain no certainty or stableness in the written constitutions of the States, or Federal government.

As respects the section under consideration, there is nothing in any other part of the Constitution, which modifies, limits, explains or refers to its provisions. It stands as an independent provision, disconnected from all others. There was nothing in any of the preceding constitutions of the State like it, or bearing on the same subject.

The word "inspection" has been defined by the Supreme Court of the United States—as accurately, perhaps, as may be elsewhere found—to be "Something which can be accomplished by looking at or weighing or measuring the thing to be inspected, or applying to it at once some crucial test. When testimony or evidence is to be taken and examined, it is not inspection in any sense whatever."—*People v. Compagnie Gen. Transatlantique,* 107 U. S. 59. Laws for the purpose are applied to articles of domestic produce and manufacture for domestic use, to those intended for exportation, as well as those imported for consumption at home.—*Clintsman v. Northrop,* 8 Cow. (N. Y.) 46; 1 Story on Const. § 1017; 11 Am. & Eng. Ency. Law, 234, n. 11.

So far as the history of inspection laws in this State throws any light on the subject—if that were needed in this case—it may be stated, that in all these laws, commencing with that of the Territorial legislature of December 12, 1796, down to the present time—of which there are several, and all set out in the briefs for appellee—with the exception of one, power was conferred on local authorities, either municipal or county, to inspect certain articles of merchandise, having reference to them as articles of commerce, and this duty, ex-

cept in the one instance referred to, had never been conferred on a State officer. The excepted case was the act of March 8, 1871, "To protect the planters of this State from imposition in the sale of fertilizers (Acts, 1870-71, p. 68). By this act, the office of an inspector of fertilizers for the State was created, with a tenure of office for four years, with power to appoint sub-inspectors for each county, whose duties and emoluments were prescribed. The act related solely to fertilizers as commercial commodities, and forbade under penalty, the sale or offering for sale within the State, any fertilizer manufactured in, or imported therein, which had not been inspected, stamped or certified to, as required by said act. There was no question about the constitutionality of that act. There was nothing in the Constitution, which forbade its passage. It belonged to that extensive mass of legislation, embracing everything in a territory or State not surrendered to the general government, or forbidden by the State Constitution to the legislature.

It is a part of the history of the State, that this law in its execution, was believed to have wrought great injustice to the people. It filled the State with a very great number of sub-inspectors, whose competency and fidelity were gravely suspected by many, and who, as charged, annoyed and burdened the people in respect to an article entering largely into the agricultural pursuits of the country. If there was any good in it, it was not considered to be of sufficient importance to outweigh the evils of maintaining a host of State officials assumed to be necessary to execute it. The creation of an unnecessary number of State officers has always been regarded as a very great evil, and so great was the discontent with, and opposition to that enactment, that the legislature in 1874 repealed it. Its alleged abuses were fresh in the minds of the people when the convention of 1875 met to form a new Constitution, and there can scarcely be a doubt, that this law, and the manner of its execution, whether good or bad, led to the incorporation into the Constitution of that year, of said section 38, Article IV of the Constitution. The mischief intended to be remedied, could not have grown out of

any of the local inspection laws theretofore authorized by law.

It seems plain, therefore, that the people in convention intended to prevent in the future the inspection or measuring of any merchandise or commodity, through an office created by the legislature for the purpose. That they might not be supposed to have intended that no inspections whatever, in any form, should be made of such things in the State, possibly out of abundant caution, they added to the prohibitory clause, the other part of the sentence—"but any county or municipality may appoint such officers when authorized by law" as had been done in the territory and State, at different periods of time, since 1816. This latter clause is a strong indication of intention, that no other inspectors of merchandise than such as had theretofore been authorized and made, should ever be authorized by the legislature to be made, and these were by the local authorities referred to.

But the contention of appellee is, in substance, that inasmuch as no inspection of merchandise had ever been made, or authorized to be made by local authorities, to protect the health, lives and property of the people, and as the legislature, prior to this enactment by the convention, had had unlimited power to adopt inspection laws, to be executed by State, county or municipal officers, the Article IV, section 38, in question, should not be construed to abridge or deny authority to the legislature for the creation of State officers for the purpose.

But, a sufficient reply to this contention seems to be, that the language of the prohibition is plain and unambiguous. If a member of the convention, most skilled in the use of language to convey the exact meaning intended, and to exclude all else, had undertaken it, perhaps he could not have been more apt in framing a plain, intelligible and unambiguous sentence than the one that was framed and adopted, to prevent all inspections of merchandise in this State through the agency of State officers appointed for the purpose. What can be plainer and more exact, than the mandate, "No State office shall be created for the inspection of any merchandise, manufacture or commodity?" The

contention that this means, that no such inspection
shall be allowed, except where it is necessary or proper
to create a State office to inspect such commodities, to
preserve the health, lives and property of the people,
imports into the sentence an exception that is not there-
in expressed, and which is a great tax on ingenuity to
devise and suggest.  If the convention had meant this,
the simplest thing in the world would have been for
them to have said so; and the fact that they did not
incorporate into the article such an exception, is very
convincing evidence that they did not intend anything
of the kind.  The construction seems to be far-fetched
and unsatisfactory, leaving on the judicial mind the im-
pression, that it would appear to be an evasion of the
fundamental law, and if indulged, that the intention
of the framers of the Constitution could, in this in-
stance, as in any other, be thwarted by unauthorized
construction.  We are not at liberty to presume that
the convention did not understand the force of lan-
guage, and that they did not mean what they have
plainly said.

We have, then, so far, declaring this inspection
statute to be violative of the Constitution—if that
were needed—the history of its enactment, and the
mischief it was designed to remedy—a mischief not
excluded from view, because the inspection here
authorized relates to oils intended for illuminating
purposes.  Under this guise, all the evils of an inspec-
tion by State officials created for the inspection of com-
modities for sale and designed to be prevented by this
constitutional provision might creep in.  Moreover, we
have the all-controlling and supreme reason, that the
convention, in the language employed, has condemned
all such inspections in language so direct, so plain and
unambiguous, as to absolutely shut us up to an accept-
ance of what they have said, leaving no room for con-
struction, and excluding any mere possible and proba-
ble meanings.

Again—to enlarge a suggestion already made—un-
der the construction contended for, State inspection
might be made, wherever it would aid in some measure,
to minimize danger to health or life in the use of any
manufactured or imported goods, or domestic products.

All statutes are designed in some way, to affect morals, health, life or limb, and to protect the property rights of the citizen. If inspections may be provided by State agencies, the stretch of authority in this direction, in its application to the unnumbered wants entering into civilized life, would be almost limitless, rendered nugatory this constitutional provision. What article of necessity could not then be subjected to inspection by State officers? Meat, fish, butter, cheese, milk, and the different vinous or spirituous liquors, engines, boilers, firearms, wagons, carriages, and nearly everything to eat, drink, wear or use, might, for the existence of adulterations, defects and imperfections in them, tending to endanger health or life, and the frauds connected with their manufacture or sale for use be made the subject of State inspection. These from a growing distrust of legislative authority, and its frequent undue exercise, the framers of the Constitution, for the greater good of the people, seemed anxious to make impossible.

Whenever and wherever supervision by inspection over the manufacture, importation and sale of such commodities, may be deemed important, the localities most affected may, under local systems of inspections sanctioned by legislative authority, have large and perhaps adequate redress. Besides, by the enactment of statutes to prevent and punish persons who sell or offer for sale, tainted or diseased meats, unwholesome breadstuffs, adulterated flour, sugar and other articles of food, vinous and spirituous liquors, and frauds in the manufacture and sale of goods and wares of different kinds, protection may in large measure be provided, if those interested will enforce such statutes. We have now, on our statute books, an extensive system of legislation of this character, under the head of offenses concerning frauds, cheats, public health, safety, convenience, etc.—Cr. Code, 1896, pp. 267, 432.

We have indulged these last reflections, not alone as a reason for sustaining this provision of the Constitution, so plain and simple as to defy the ordinary rules for the construction of laws, where there remains any doubt of their meaning, but to show, that after all, by maintaining the provision as here construed, the peo-

ple are not deprived of legislation for the protection of their lives, health and property. There remains, still untouched by this provision of the Constitution, all the authority in the legislature to enact quarantine and health laws, that it has at any time in the history of the State exercised, or that there may, perhaps, ever be any necessity to exercise for such purposes.

The judgment of the court below is reversed, and one will be here rendered, according to the prayer of the petition.

Reversed and rendered.

BRICKELL, C. J., *dissents.*