[Civ. No. 1285.   Third Appellate District.—October 2, 1915.]

CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), Respondent, v. T. F. McGOVERN et al., as Members of and Constituting the Board of Supervisors of the County of Tuolumne et al., Appellants.

CONSTITUTIONAL LAW—RULE OF CONSTRUCTION.—Whenever a constitutional provision is plain and unambiguous and no two meanings can be placed on the words employed, it is mandatory, and courts are bound to obey it.

ID.—TAXATION—PROPERTY OF CITY AND COUNTY OF SAN FRANCISCO OUTSIDE OF TERRITORIAL LIMITS—MUNICIPAL WATER SYSTEM—EXEMPTION.—Under the provisions of section 1 of article XIII of the constitution, as it stood prior to the amendment of 1914, property acquired by the city and county of San Francisco outside of its territorial limits for the purpose of building, constructing, operating, and maintaining a municipal waterworks and supply for the benefit of said city and county and the inhabitants thereof, and incidentally to supply water, light, and power to cities outside of such municipality, is exempt from taxation, and *mandamus* will lie to compel the cancellation of assessments of such property for taxes and sales made for nonpayment of any taxes levied against it.

ID.—MUNICIPAL PROPERTY EXEMPT FROM TAXATION—CONSTRUCTION OF CONSTITUTION.—Under such constitutional provision, all property belonging to a municipal corporation is exempt from taxation, regardless of its location or the use to which it is to be put, as the language employed in such section in classifying the property declared to be exempt from taxation limits the exemption to property *used* for free public libraries, and free museums, and such property as may *belong* to the United States, this state or to any county or municipal corporation within this state—the word "belong" being employed to denote an unqualified ownership of the property, and not an ownership subject to the condition that the property was to be used exclusively for governmental purposes.

ID.—RULE OF CONSTRUCTION—WORDS TO BE GIVEN ORDINARY MEANING.—The constitution of a state derives its force and authority from the vote of the people adopting it, and for that reason, it is a general rule that in construing the provisions of a constitution the words employed therein shall be given the meaning which they bear in ordinary use among the people.

ID.—PRIVATE HOLDING OF OUTSIDE PROPERTY BY MUNICIPALITIES—NONEXISTENCE OF STATUTES PRIOR TO CONSTITUTION—IMMATERIALITY.—In determining the meaning of the word "property" as used in such constitutional provision, it is immaterial that at the time of the adoption of the constitution in 1879, there were no existing statutes authorizing municipal corporations or counties to hold property situated without their boundaries for private or proprietary purposes, in view of the plain language of the provision.

ID.—EXEMPTION OF MUNICIPAL PROPERTY—VIOLATION OF FEDERAL CONSTITUTION—COUNTY NOT A PARTY AGGRIEVED.—A county in levying a tax to raise revenue for the support of its county government is not a party aggrieved by the exemption of a particular piece of property from taxation, and cannot raise the question that the construction of the constitution exempting property of a municipal corporation from taxation within its boundaries, is in conflict with section 1 of amendment XIV of the federal constitution.

APPEAL from a judgment of the Superior Court of San Joaquin County.   Frank H. Smith, Judge.

The facts are stated in the opinion of the court.

Rowan Hardin, District Attorney of Tuolumne County, J. C. Campbell, Frank C. Scherrer, Walter Shelton, and Thomas Breeze, for Appellants.

Percy V. Long, City Attorney of the City and County of San Francisco, J. F. English, and Robert M. Searls, Assistant City Attorneys, for Respondent.

CHIPMAN, P. J.—The action arises on a petition for a writ of mandate by the city and county of San Francisco against the board of supervisors and the district attorney of Tuolumne County, asking for a writ of mandate compelling such board of supervisors to have entered upon the minutes of said board an order directing the auditor of the county of Tuolumne to cancel certain assessments for taxes for the fiscal years 1911 and '12, and 1912 and '13; and likewise directing such board of supervisors to direct the auditor of said county of Tuolumne to cancel any other assessments which may have been levied by the assessor of said county upon any other property belonging to the said city and county of San Francisco located in the county of Tuolumne, and likewise directing said board of supervisors to direct the auditor and recorder of said county of Tuolumne to cancel any and all sales of any of the property described in the petition which may have been sold to the state of California for nonpayment of any taxes levied against said property.

The petition further prays that a writ of mandate issue against the defendant Rowan Hardin, as district attorney of said county of Tuolumne, directing him to give his written consent to such action of said board of supervisors, together with such other relief as to the court may seem meet and equitable in the premises, and for costs of suit.

This action was originally commenced in the city and county of San Francisco and, on the fourteenth day of February, 1913, the superior court of said city and county issued an alternative writ of mandate commanding the defendants to do and perform the acts hereinbefore stated or to appear

before said superior court in the city and county of San Francisco and show cause why they should not proceed in accordance with the said writ. Thereafter the defendants appeared and moved for a change of the place of trial of said action to the county of Tuolumne and at the same time interposed their demurrer to the petition. Subsequently, by stipulation of all the parties, said motion for a change of venue was denied without prejudice and the action was transferred to department 1 of the superior court of San Joaquin County for further hearing and determination. The matter was heard on defendants' demurrer to the petition and plaintiff's demurrer to the answer. The court overruled the demurrer to the petition, sustained the demurrer to the answer and gave judgment that the peremptory writ issue as prayed. Defendants appeal from the judgment.

The property involved consists of certain lands, rights, and claims for the construction of certain works in connection with the Hetch-Hetchy and Lake Eleanor water supply for the city and county of San Francisco, the sources of said water supply being located in Tuolumne County.

Plaintiff alleged, in paragraph VI of its complaint: "That said property was acquired by said city and county of San Francisco for the purpose of building, constructing, operating, and maintaining a public utility, to wit, a municipal waterworks and supply for the benefit of said city and county of San Francisco and the inhabitants thereof. That all of said property was acquired by said city and county either by purchase or by original appropriation by said city and county of dam or reservoir sites, or powerhouse sites, under the law of the state of California. That the said city and county of San Francisco has so expended in the purchase of said property a sum of money in excess of $1,000,-000."

The first paragraph of defendants' answer reads as follows: "In answer to paragraph VI of said complaint and petition these defendants admit that the property mentioned and described in said petition and complaint was acquired by the said city and county of San Francisco for the purpose of building, constructing, operating and maintaining a public utility, to wit, a municipal waterworks and water supply for the benefit of said city and county of San Francisco and the inhabitants thereof; but allege that in addition to pur-

chasing, operating and maintaining said public utility for the benefit of the said city and county of San Francisco that said plaintiff and petitioner does intend to construct, operate, and maintain said waterworks and public utility for the purpose of selling water and operating without the boundaries of said municipal corporation, and does contemplate and intend to derive a revenue from such operation and sale of water.''

The proceedings of the city leading up to and including the purchase of the property and the location of certain rights and claims and the purpose thereof are fully set forth and not denied. It is also alleged that all of the city's property in Tuolumne County is necessary for the construction and operation by the city of its municipal works and water supply, as fully set forth, and that all of it will be used and operated for such municipal waterworks for the city and its inhabitants. Looking at the entire pleadings and considering the course which the discussion took in the briefs, we think the demurrers were ruled upon on the assumption that plaintiff's said property is to be used mainly for the purpose of supplying the city of San Francisco and its inhabitants with water, light, and power, but also to supply, at least incidentally, water, light, and power to cities and inhabitants outside of the city and county of San Francisco.

Plaintiff's claim is founded on section 1 of article XIII of the constitution which, as it stood at the time the property was acquired and the action was tried, read as follows: ''All property in the state, except as otherwise in this constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided. The word 'property,' as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership; provided, that a mortgage . . . shall not be considered property subject to taxation; and further provided, that property used for free public libraries and free museums, growing crops, property used exclusively for public schools, and such as may belong to the United States, this state, or to any county or municipal corporation within this state shall be exempt from taxation. The legislature may provide, except in the case of credits

secured by mortgage or deed of trust, for a deduction from credits due to *bona fide* residents of this state.''

The only question involved is as to the true meaning of this section of article XIII of the constitution.

In their brief defendants address themselves to two propositions: 1, The only property of a municipality or county exempt from taxation, is that which is held for governmental purposes. 2. The property of a municipality held in its private and proprietary capacity situated in a taxing district other than that in which the municipality is located is subject to taxation by that district.

In support of the first proposition, *South Pasadena* v. *Pasadena Land etc. Co.*, 152 Cal. 579, 593, [93 Pac. 490], and *Davoust* v. *City of Alameda*, 149 Cal. 69, 72, [9 Ann. Cas. 847, 5 L. R. A. (N. S.) 536, 84 Pac. 760], are cited. In the former of these cases a water system was involved and in the latter the operating of an electric plant, and the court held that in such matters ''a city does not act in its governmental capacity, but in a proprietary and only *quasi* public capacity.''

In further confirmation of the proposition that the exercise of the function of ownership and operation of a public utility by a municipality for the benefit of its inhabitants does not make it civic or govenmental, the following cases are cited: *Safety Insulated Wire & Cable Co.* v. *Baltimore*, 66 Fed. 140, 143, [13 C. C. A. 375]; *New Orleans M. & C. R. Co.* v. *New Orleans*, 26 La. Ann. 478, 481. It is hence claimed ''that when the constitution speaks of the property 'of any county or municipal corporation,' the language may be interpreted as referring to a county or municipal corporation either in the primary significance of mere governmental agencies or as including the evolved *status* of *quasi* private proprietors.'' It is contended that the phrase used in the constitution—''such (property) as may belong . . . to any county or municipal corporation''—indicates that the word ''belong'' was used to denote relationship or appurtenance and not to denote ownership; that property in itself denotes ownership ''for a thing cannot be property unless it is owned. In this sense it is correct to speak of the property of a person, not of the property belonging to a person. But if we wish to speak of property held by a person in a certain capacity as bearing a certain relation to him, then we may

properly speak of property belonging to him in the capacity
or relationship which is stated or implied." Attention is
called to section 14 of article XIII, which reads: "The
moneyed capital, reserve, surplus, undivided profits and all
other property belonging to unincorporated banks or bank-
ers of this state, or held by any bank located in this state
. . . shall be likewise assessed and taxed to such banks or
bankers . . . in the manner to be provided by law, and taxed
at the same rate as is levied upon the shares of the capital
stock of incorporated banks." It is obvious, says the brief,
that the word "belong" as thus used refers only to the
property of the banker owned by him in the capacity of a
banker and not to his home or private investments. Occur-
ring in the same article of the constitution as does the word
"belong" used in section 1, it is contended that no reason
can be advanced why the word, as it occurs in section 1,
should not be given the same meaning. The case of *Chicago
Theological Seminary* v. *Illinois*, 188 U. S. 662, [47 L. Ed.
641, 23 Sup. Ct. Rep. 386], is cited as persuasive if not conclu-
sive of the soundness of defendants' contention. This was a
case that went up to the United States supreme court from the
Illinois supreme court on writ of error. That state created
a corporation for religious and benevolent purposes under
the name of The Board of Directors of the Chicago Theo-
logical Seminary. Section 2 provided "that the seminary
shall be located at or near the city of Chicago. The object
shall be to provide instruction and the means of education
to young men preparing for the gospel ministry," etc. Sec-
tion 5 provided: "That the property, of whatever descrip-
tion, belonging or appertaining to said seminary, shall be
forever free and exempt from all taxation for all purposes
whatsoever." The court held that property of the corpora-
tion located outside of the limits of the seminary itself, not
used directly for the seminary, though the rentals therefrom
were used for its benefit, was not exempt from taxation.

Having presented the principal reasons given by defend-
ants in support of their first proposition, we will state briefly
their position as to the second. It is claimed that at the time
of the adoption of the constitution, in 1879, there were no
existing statutes, general, or special, authorizing municipal
corporations or counties to hold property, situated without
their boundaries, for non-governmental—that is, private or

proprietary—purposes. It is hence argued that, because in 1879 the ownership of land by a municipality, outside its limits, for proprietary purposes would be *ultra vires*, it follows that the word "property" in the section under discussion cannot be deemed to refer to land so situated and held. *Newport* v. *Unity*, 68 N. H. 587, [73 Am. St. Rep. 626, 44 Atl. 704], is claimed to be directly in point. Attention is called to section 19 of article XI of the constitution, as adopted October 10, 1911, vesting in any municipal corporation the right to "establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communication" . . . ; and further providing that "a municipal corporation may furnish such services to inhabitants outside its boundaries; provided, that it shall not furnish any service to the inhabitants of any other municipality owning or operating works supplying the same service to such inhabitants without the consent of such other municipality, expressed by ordinance." It is contended that, under the power thus given, San Francisco may enter the city of Stockton, for example, which owns no municipal power, light or water system, in full competition with every public service corporation and person operating in said city and county; that, as a consequence of the construction placed upon section 1 of article XIII by plaintiff, the private persons and public service corporations must pay a tax to maintain the state and county governments, while San Francisco, with power and pipe-lines spread throughout the county and owning valuable properties there and engaged in the same business, would pay no tax. Under such state of facts, it is claimed, we have a conflict with the fourteenth amendment of the federal constitution which provides that no state shall deny to any person within its jurisdiction the equal protection of the law. It is urged that the different provisions of the constitution must be construed together and that it is the duty of the court to adopt such construction as will, if possible, prevent a conflict with the federal constitution. (Citing Black on Interpretation of Law, p. 24; Endlich on Interpretation, sec. 523.) That Tuolumne County is in a position to raise this constitutional question is urged for the reason that it is an interested party to the extent that

its power to levy and collect taxes on property within its boundaries is in question.

We have thus endeavored to present the salient points urged for a reversal of the judgment, deeming it but just that, in a case of such far-reaching importance, the reasons impelling defendants to seek a review of the matter should be fully stated.

As a complete and conclusive answer to all of defendants' contentions, plaintiff claims that, under section 1 of article XIII of the constitution (and also section 3607 of the Political Code), neither the location of the property nor the use to which it is to be put has any bearing upon the question, for the reason that the section of the constitution (the code section as well) is plain and unambiguous and hence is not subject to judicial interpretation. Defendants admit in their brief that "if the constitutional provision be not open to construction, the argument *ab inconvenienti* is not one which can address itself to the court—that is a matter for consideration by the legislature, not the judicial department of government." The rule of construction is found in many cases and in text-books and was well stated in *State* v. *McGough*, 118 Ala. 159, [24 South. 395, 396, 397], as follows: "It is to be admitted broadly that the object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. That their intent is deduced, not only from the language of the particular provision to be construed, but in connection with all the other parts of the instrument; from its history, and from a consideration of the causes which led to its adoption, and the mischief it was intended to remedy (citing cases). But there are other rules of interpretation that may override all others, as 'where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature (or framers of a constitution) should be intended to mean what they have plainly expressed, and consequently, no room is left for construction. Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere.' . . . Whenever a constitutional provision is plain and unambiguous, when no two meanings can be placed on the words employed, it is mandatory, and courts are bound to obey it. Such a mandate, whether wise or unwise, whether founded upon

good reasons or not, is obligatory, and cannot be construed away by the history of the past, or by any mischief that it may be supposed it was intended to remedy." (See Cooley on Constitutional Limitations, pp. 89–91; *Maxwell* v. *Dow,* 176 U. S. 581, 602, [44 L. Ed. 597, 20 Sup. Ct. Rep. 448].)

We find ourselves unable to discover, from the language employed in the constitution, any reason for interpretation, or ground for entertaining doubt as to its meaning. The language employed in classifying the property declared to be exempt from taxation, it will be noted, limits the exemption as to property *used* for free public libraries and free museums and property *used* for public schools, but the language following is—"and such (property) as may *belong* to the United States, this state, or to any county or municipal corporation within this state shall be exempt from taxation." The condition here seems only to be that it (the property) shall "belong" to the United States, etc. Its location or use is not made a condition of its exemption. The word "belong" is applied alike and with the same force and meaning to the United States, this state, and to counties and municipalities, and it seems to us was employed to denote an unqualified ownership of the property, not an ownership subject to the condition that it was to be used exclusively for governmental purposes. Certainly it was not intended to attach any such condition to property belonging to the United States or this state and how can we give it a different meaning as applied to counties and municipalities? "The constitution of a state derives its force and authority from the vote of the people adopting it. For that reason it is a general rule that in construing the provisions of a constitution the words employed therein shall be given the meaning which they bear in ordinary use among the people. The natural and ordinary meaning of the words is to be accepted, except where a word is used the meaning whereof is established by statute or by judicial construction." (*Burke* v. *Snively,* 208 Ill. 328, [70 N. E. 327, 329].) All the dictionaries give to the word "belong," among other meanings, the definition: "To be the property of" (Webster, Century); "To be possessed by" (Worcester). That this was the sense in which the framers of the constitution used the word will be seen when we consider the debates upon its adoption by the constitutional convention hereinafter to be noticed. It is true, as suggested

by defendants, that we must rather look to the sense in which the people regarded the word, when they voted at the polls, for it was the people, and not the framers who finally passed upon the provision. We must, however, assume that the people gave to the word its ordinary and natural meaning and in doing so we can reach no other conclusion than that they understood the provision to exempt "such (property) as may belong to" as meaning "such (property) as was owned by" or "the property of" the United States, this state, etc. The argument that the use of the word "belonging," in section 14 of article XIII, throws light upon its use in section 1 we think without force. There the language "belonging to unincorporated banks or bankers of this state" shows upon its face that the taxable property mentioned was meant to be the property of the unincorporated bank or banker used in carrying on the business in the capacity of a banking concern. In looking over the provisions of the constitution it will be found that in many places the words "belonging to" are used interchangeably with the words "the property of." So in referring to the property of "The California School of Mechanical Arts," the "California Academy of Sciences," the "Cogswell Polytechnical College." (Art. IX, secs. 11, 12 and 13.) So as to lands "belonging to this state" which are suitable for cultivation, etc. (Art. XVII, sec. 3.) So as to moneys, etc., "belonging to" any county, etc., to be deposited, etc. (Art. XI, secs. 16 and 16½.) This, too, has been the expression used in the statutes, from an early day, exempting property "belonging to the state, or to any municipal corporation," etc. Statutes of 1859, page 343, interpreted in *People* v. *Doe*, 36 Cal. 220, 222, 223, as meaning impliedly any property owned by any such county, etc. Plaintiff cites several cases in which exemptions of property are declared in similar language to that used in our constitution and the courts held it to mean "owned by": *City of Meridian* v. *Phelps*, 65 Miss. 362, [x South. 119] ; *Board of Comrs.* v. *City of Wellington*, 66 Kan. 590, [60 L. R. A. 850, 72 Pac. 216] ; *Warren County* v. *Nall*, 78 Miss. 726, [29 South. 755, 758] ; *Black* v. *Sherwood*, 84 Va. 906, [6 S. E. 484]. The Illinois case relied on by defendants, 188 U. S. 662, [47 L. Ed. 641, 23 Sup. Ct. Rep. 386], may be distinguished from the case here. In that case a majority of the judges of the United States supreme court adopted the

views of the state court "with some hesitation," Chief Justice White and Justices Brown and Holmes dissenting. The discussion in the opinions may be read with profit. The language of the charter read: property "belonging or appertaining to said seminary," not to said corporation, and this language was much commented upon as indicating its true meaning. In our constitution the language seems clearly to have been used as denoting ownership.

It is urged that there were no statutes existing in 1879, when the new constitution was adopted, which authorized municipalities to own property outside their boundaries for purposes other than governmental purposes and as so to hold property would have been *ultra vires,* the word "property" in the action under discussion cannot be deemed to refer to land so situated and held. *Newport* v. *Unity,* 68 N. H. 587, [73 Am. St. Rep. 626, 44 Atl. 704], is cited as presenting the exact question. Prior to the year 1867 towns had no general authority in New Hampshire to purchase real estate outside their limits. They might, as the court stated, acquire land outside their limits by gift or by levy in the collection of a debt but not otherwise—not even by eminent domain. Subsequently, towns were authorized to establish waterworks by acts broad enough to authorize them to take and condemn land outside their limits. In the revision of 1867, for the first time in the law there was introduced a provision in regard to the exemption of town property from taxation: "Real estate . . . is liable to be taxed except . . . property of the state, county or town." The court said: "If there were at the time of the revision of 1867 no statutes authorizing towns to purchase real estate outside their limits, it seems plain that the statute is not necessarily to be construed as exempting such property from taxation. The legislature could not have had it in mind. Hence, when they subsequently authorized towns and cities to acquire for public purposes lands in other towns, it cannot be justly presumed that they intended such property to be exempt from taxation. The purpose of this statute of exemption was to avoid the assessment and collection of a tax upon the property of a town used for public purposes by the people of the town, as on a pound or town house, for the reason that it would be a useless and unnecessary expense and trouble. But to interpret this statute so as to exempt the property of a town

used for public purposes, which is situate in another town, is to extend the exemption beyond the reason and purpose of the statute. . . . It would," said the court, "require express words to warrant a holding that one town can invade another, and, by taking a portion of the territory for their own benefit, whether the purpose be in a legal sense public or private, subject the remaining lands of such town to a heavier burden of taxation." This case is of no value in the discussion except to show that if section 1 of article XIII of the constitution is open to construction, the rule in that case supports the contention of defendants. Neither would the fact, if it be the fact, that no general statutes authorized municipalities to hold property outside their boundaries for other than governmental purposes be of material consequence. If, as we hold, there is no room for construction we must give full effect to the mandate of the constitution. Indeed, the Unity case, seems to assume that if the terms of the statute were express to that effect the property, whether public or private, might be made exempt from taxation. But this case was criticised in the subsequent case of *Canaan* v. *Enfield etc. District,* 74 N. H. 517, [70 Atl. 250], in which it was held that the property of the Enfield Village Fire District, situated in Canaan, but used in the construction or operation of the waterworks of the district, was exempt from taxation and the court found the grounds of the decision in the Unity case to be "fallacious." We quote from the later decision, at page 253:

"It would seem that, both upon principle and authority, the public property of towns is not taxable unless specifically made so by clear legislative language. The presumption, which has by long and universal acquiescence become a rule of law, is against its taxability. If the court in *Newport* v. *Unity.* had started with the premise that public property of a town is not ordinarily included in a general taxing statute, and cannot be taxed unless specifically mentioned, it is probable that it would not have held substantially that the waterworks in question were taxable because not specifically exempted from the operation of the general statute. . . . But argument and discussion are unnecessary to prove that the public character of the use made of the property does not depend upon its territorial location. An imaginary line drawn around land used as a reservoir for the supply of pure

water to the inhabitants of an adjoining town, and a legislative act annexing the land thus designated to such town, would not affect the character of the use, or make it public if it was not so before. The admission that such intra-territorial property would be held for public purposes is a concession that when located extra-territorially it serves the public to the same extent, and for all practical purposes its use is the same. (*Schneider* v. *Menasha,* 118 Wis. 298, [99 Am. St. Rep. 996, 95 N. W. 94].) When, therefore, it is settled or admitted that the public waterworks of a town are not taxable unless specially included in the tax list, it would seem to follow that the tax immunity must extend to its land used in connection therewith located in another town. In the absence of express statutory authority to tax it, legislative authority for its public use by the town indicates an intention that it should be treated as nontaxable, as in the case of intra-territorial property. In this view of the case it is not apparent why the location of the property should determine the question of its subjection to the tax laws. The authorities generally recognize no such distinction. (See *Stiles* v. *Newport,* 76 Vt. 154, [56 Atl. 662]; *Somerville* v. *Waltham,* 170 Mass. 160, [48 N. E. 1092]; *West Hartford* v. *Board of Water Commissioners,* 44 Conn. 360, 369; *People* v. *Assessors,* 111 N. Y. 505, 507, [2 L. R. A. 148, 19 N. E. 90]; *Camden County* v. *Washington,* 60 N. J. L. 367, [37 Atl. 623]; *Hackettstown* v. *Mt. Olive,* 63 N. J. L. 191, [42 Atl. 838].) If waterworks like the defendant's are devoted to a public purpose when located within the water district, they serve the same purpose when located outside the district; and since it is conceded that in the former case they partake sufficiently of a public character to be free from the burden of taxation, no sufficient reason is suggested why in the latter case they do not in fact possess the same character.''

Defendants' reply is that the case of *Newport* v. *Unity* was overruled by *Canaan* v. *Enfield* on the ground that the court in the former case erroneously assumed that public property was taxable unless expressly exempted and that the decision would have been correct but for the fact, held in the later case, that the presumption was the converse. And it is contended that the presumption in California is as was assumed in *Newport* v. *Unity* and hence that case ''must stand as persuasive in this state unaffected by the criticism

in *Canaan* v. *Enfield.*" Plaintiff retorts that defendants are mistaken and that "all publicly owned property always has been impliedly exempt from taxation."

The constitution of 1849 contained no express exemption and, in *People* v. *McCreery*, 34 Cal. 432, 456, the presumption of exemption was held to exist. Impliedly it was so held in that case and in *People* v. *Doe*, 36 Cal. 220, 222, 223. In the case we now have before us no question of implied exemption arises. If the property is publicly owned, i. e., belongs to the United States, this state or to a county or municipality of this state, neither its location nor the purpose for which it is used is material. Ownership alone confers exemption from taxation. The question is approached and discussed by counsel from other angles but we do not deem it necessary to pursue them.

If, however, there be such uncertainty as to the meaning of the terms used in the constitution as would warrant our inquiring into the intention of its framers (and constitutional debates may be referred to in aid of interpretation, *Older* v. *Superior Court*, 157 Cal. 770, 776, [109 Pac. 478]), the proceedings in the constitutional convention cast much light upon section 1 of article XIII, in respect of the question now here. The debate will be found in volume III, pp. 1463 et seq., from which we quote:

"Mr. Edgerton: Mr. President: I offer an amendment.

"The Secretary read: 'Insert after the word "taxation," in line six, the following: "But property of any county or municipal corporation not within the limits of said county or corporation, shall be subject to local taxation in the county where the same is situated." '

"Mr. Edgerton: Mr. President: I offer that amendment and I am in favor of it. Now, the Spring Valley Water Works are situated in San Mateo County, and constitute a very material part of the taxable property of that county. Propositions have been made from time to time pointing to the acquisition of these works by the city of San Francisco. Now, it does seem to me that the inhabitants of San Francisco, when they acquire and hold that property in the county of San Mateo, ought to pay the tax upon it. The burden rests upon the inhabitants of San Mateo County, while the people of San Francisco enjoy all the benefits. It seems to

me wrong for one community to own and enjoy property at the expense of another community.

"Mr. Miller: Mr. President: It is only necessary to state the case that the gentleman has stated to convince any body that the amendment ought not to be adopted. It would work a great hardship. The county of San Mateo would derive the money for the support of their government from San Francisco. No public property should be taxed.

"Mr. Moffat: Mr. President: I am in favor of the proposition. This water company controls twenty-five thousand acres of land in San Mateo County, and are constantly acquiring more. Nearly all that land will be covered with water and used for the benefit of San Francisco. All that land will be exempt from taxation, which is unjust to the taxpayers of San Mateo County.

"Mr. Rolfe: Mr. President: Our cities and towns are, and probably always will be authorized to hold and own ground for cemeteries outside of their town limits. That is perfectly proper. Under such an amendment as this they would have to pay taxes on these cemeteries. That is one instance in which it would work a wrong.

"Mr. McCallum: Mr. President: This amendment proceeds upon a fundamental error. It assumes that the county is separate from the state. As to the necessity for it, there is no necessity for it; when we say all public property shall be exempt from taxation, that includes all property belonging to a county, city, or town. To say that one county shall tax another county, is to say that the state shall tax its own property. I do not see any likelihood of the purchase being made, as the gentleman suggests.

"Mr. Edgerton: Mr. President: The state does not tax its own property, because that would simply be taking money out of one pocket and putting it in another. But this is a different case. Even the expenses of condemnation would have to be paid by the people of San Mateo County; the expenses of the court, the witnesses, and all the officers, would have to be paid by them for the benefit of the people of San Francisco. There are twenty-five thousand acres of land necessary to those waterworks; and you might condemn half the county, and shift the burdens of taxation on to the other half, while citizens of San Francisco enjoy the benefits.

"Mr. Reynolds: Mr. President: The gentleman says the expenses of condemnation must be paid by the county of San Mateo. I had supposed that the gentleman understood by this time that in a civil action the expenses are paid by the litigants.

"Mr. Edgerton: Allow me—

"Mr. Reynolds: No, sir; in the language of the gentleman from Los Angeles, 'Go away; go away.' (Laughter.) Now, sir, the theory upon which this amendment proceeds is wrong, the gentleman to the contrary notwithstanding. No such thing can be found anywhere in the United States. Who ever heard of the different counties of the state of New York taxing the waterworks of that city, or anywhere else in the world? Who ever heard of such a thing? It is absurd. If the city of San Francisco ever condemns this property, she wants water, and not land, any more than is necessary. If this could be done, the county of San Mateo might tax it to the tune of millions of dollars. There is scarcely any limit to its value. This land that is talked of belongs to the Spring Valley Water Company, who hold it for the purpose of monopolizing all the water in the country, and it is taxed to them. But there is no probability of San Francisco condemning all that land. There is no good reason for such an amendment as this, and I hope it will be voted down.

"Mr. Wilson, of First District: Mr. President: This amendment, though it comes from Sacramento, really originated in San Mateo, hence is based on purely selfish reasons. I suppose the citizens of San Francisco, for the same selfish reasons, can oppose it, and seek to avoid the burdens which it seeks to impose on them. Now, as already stated here, this is an entire novelty, and violates the common principles of taxation, that the government never taxes itself, either as a whole, or in any integral part of it. Counties are simply subdivisions of the state for the convenience of local government, but they are a part of the general government of a state. Now, why is it that the state is permitted to own property here in Sacramento without paying taxes on it. Here is this capitol, and the grounds around it. Why not tax them for the benefit of Sacramento? It would not be taking money out of one pocket and putting it into the other, according to the theory of the gentleman from Sacramento, because it would come out of the pockets of the people all

over the state, and go into the pockets of the people of Sacramento. Why should not the county of Marin tax the state prison, and the counties of Napa and San Joaquin the asylums? It is exactly the same principle. The application is different, but the principle is exactly the same. San Francisco as a subdivision of the state, may acquire the Spring Valley Water Works. If she does she ought not to be subject to taxation, because it is a part of the state property. This amendment, if it should pass, would simply amount to a prohibition to San Francisco from purchasing that property. She never would purchase it under these circumstances. I have no idea that waterworks of New York or Boston are taxed by the different counties in which they are situated. I know that such is not the case in regard to the waterworks in Washington. If there are any such instances in the United States I have never heard of them. It would be a violation of the fundamental principles of taxation that public property should be taxed. I hope therefore that the amendment will be rejected. . . .

"The President: The question is on the adoption of the amendment of the gentleman from Sacramento, Mr. Edgerton.

"Lost."

Judge Cooley, in his work on Constitutional Limitations (7th ed., p. 102), says that the debates of a constitutional convention on construction are less conclusive than legislative proceedings as to the construction of a statute, "since in the latter case it is the intent of the legislature we seek, while in the former we are endeavoring to arrive at the intent of the people, through the discussions and declarations of their representatives." At page 101 he says: "The intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." We feel quite sure that "the man on the street" would naturally understand the word "belong" as used in the section to mean "the property of."

No one can for a moment doubt that the framers of the constitution regarded the section under discussion as exempt-

ing property owned by the United States, this state or any
county or municipality in this state. The only question
that might arise is whether they or the people who voted
to adopt the constitution had in mind the use of property
for other than governmental purposes—whether they an-
ticipated the case we have here of a use in a proprietary
capacity in connection with the governmental use. The
answer, it seems to us, must be that the language used is
clear and unmistakable, and had it been the intention of
the framers to place the condition of governmental use
upon the exemption they would have so provided as they
did when they exempted "property *used* for free public
libraries and free museums" and "property *used* exclusively
for public schools." This view would seem to be strength-
ened by the amendment of section 1 of article XIII, adopted
in November, 1914, since the case was decided in the
lower court. The section as amended is substantially the
same as it stood after the amendment in 1879 and 1910, 1914?
except that it expressly provides for a situation under which
the lands exempted from taxation by the section may be
taxed thus impliedly, at least, assuming that the section ex-
empts property "belonging to," i. e., owned by the United
States, this state, etc. After the words "shall be exempt
from taxation," the section reads: "except such lands and
the improvements thereon located outside of the county,
city and county or municipal corporation owning the same
*as were subject to taxation at the time of the acquisition of
the same* by said county, city and county or municipal cor-
poration; *provided,* that no improvements of any character
whatever constructed by any county, city and county or
municipal corporation shall be subject to taxation. All
lands or improvements thereon, belonging to any county,
city and county or municipal corporation, not exempt from
taxation, shall be assessed by the assessor of the county, city
and county or municipal corporation in which said lands or
improvements are located, and said assessment shall be sub-
ject to review, equalization and adjustment by the state
board of equalization."

We should hesitate to express an opinion as to the full
scope and meaning of this last amendment, nor is it now
necessary to do so. It implies, we think, that the preceding
provisions exempt from taxation such property "as may be-

long to the United States, this state, or to any county or municipal corporation within this state," and subjoins conditions under which certain of such property may be taxed.

We quite agree with defendants that the construction we have given the section would make it possible for municipalities to own and operate public utilities beyond their boundaries—section 19 of article XI, as we have seen, grants such power; and so to engage in business may, by their exemption from taxation, bring them in unequal competition with private corporations and individuals engaged in like enterprises. If, however, the power is clearly given by the fundamental law of the state it is no answer to its validity that it may work hardships to certain privately owned properties, for the people must be presumed to have considered the natural and inevitable consequences of their action in adopting the constitutional provisions.

The remaining question is: Does the construction contended for by plaintiff involve a conflict with section 1 of amendment XIV of the federal constitution which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Respondent makes the point that the defendants are in no position to raise the question, and it seems to us at least doubtful whether they can do so. The purpose of Tuolumne County in levying a tax is to raise revenue for the support of the county government. The exemption of a particular class or piece of property in no wise interferes with the raising of the necessary revenues on the remaining property in the county; it may to some extent increase the burden on this remaining property but that is a matter of concern only to the property owners and they are not parties to the action. The county government in the exercise of its function is not interfered with; its property is not affected for it is, under no circumstances, subject to taxation. Under what rule of procedure, then, can the county, itself not aggrieved, be heard to raise the federal question in the interest alone of some supposed taxpayer or class of taxpayers?

The supposed case of the city of San Francisco furnishing power and light to the city of Stockton in unfair competition with private corporations or individuals giving like service, presents no violation of any right given the latter by their franchise, since the state, in granting a franchise, does

not part with the right to engage in the business contemplated by the franchise nor does the state guarantee that it will not so engage as a competitor.

Inasmuch as the constitution expressly grants to one city or municipality the right to construct and operate a public utility in another city, the construction places upon it no more restraints when thus engaged than where it so engages within its own boundaries in competition with a local public utility. It was said, in *Hamilton Gas, Light & Coke Co.* v. *City of Hamilton,* 146 U. S. 268, [36 L. Ed. 963, 13 Sup. Ct. Rep. 90] : "It may be that the erection and maintenance of gas works by the city at the public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established." (*Lehigh Water Co.* v. *Easton,* 121 U. S. 388, [30 L. Ed. 1059, 7 Sup. Ct Rep. 916] ; *Skaneateles Water Works Co.* v. *Skaneateles,* 184 U. S. 354, [46 L. Ed. 585, 22 Sup. Ct. Rep. 400].) That the impairment of the value of the works of the private corporation by municipal competition is not the taking of property without due process of law within the meaning of the federal constitution, nor the taking of property without just compensation within the meaning of the constitution of the state of Mississippi, was held in *Mayor etc. Meridian* v. *Farmers L. & T. Co.,* 143 Fed. 71, [6 Ann. Cas. 599, 74 C. C. A. 221]. We cannot see that relieving the municipally owned property from the payment of taxes would so add to its advantage over the private corporation as to justify us in holding that it violates the provision of the federal constitution relied on by defendants. The exemption from taxation is only one of many elements of advantage which the municipality would have over the private corporation. It is conceded that the property of the municipality for municipal purposes within its boundaries is exempt from taxation and by implication its property so used without its boundaries is also exempt. Implied exemption may not extend to property not devoted to governmental or public purposes upon the principle enunciated in *San Diego* v. *Linda Vista Irr. Dist.,* 108 Cal. 189, [35 L. R. A. 33, 41 Pac. 291], but the reason there given why the property was not exempt from the payment of an assessment was because the assessment was held not to be a tax within

the meaning of section 1 of article XIII of the constitution. The court said: "As there is no express exemption in the law under which the district was organized, the exemption could not be extended by implication to property which is not held or used for municipal or governmental purposes." It would seem that if the law had expressly exempted this property from the assessment it would have been sustained.

It is the theory of our system of government that the state and the nation alike are to exercise their powers respectively in as full and ample a manner as the proper departments of government shall determine to be needful and just, and as might be done by any other sovereignty. This theory by necessary implication excludes wholly any interference by either the state or the nation with an independent exercise by the other of its constitutional powers. (1 Cooley on Taxation, p. 129.)

The right to make exemptions is involved in the right to select the subjects of taxation and apportion the public burdens among them and must, consequently, be understood to exist in the law-making power whenever it has not in terms been taken away. (1 Cooley on Taxation, p. 343.) Cases are cited in the notes where legislatures have exempted manufacturing establishments or shipbuilding and it is shown that the principle of uniformity is not infringed by exempting property from taxation, or by remitting taxes. It was held, in *Gibbons* v. *District of Columbia*, 116 U. S. 404, [29 L. Ed. 680, 6 Sup. Ct. Rep. 427], that "Congress, like a state legislature, unrestricted by constitutional provision, may, at its discretion, wholly exempt from taxation certain classes of property of the District of Columbia or may tax them at a rate lower than that imposed upon other property." (1 Cooley on Taxation, p. 346.)

The effect of all exemptions from taxation—and they are many—whether in the interest of the husbandman, the mechanic and laborer or the manufacturer, whether of property used for educational purposes, for free public libraries, charitable institutions, or churches—the effect of all these exemptions is to increase the burden of taxation upon the property not exempt. But the power thus exercised by the state has never been held to deny to any individual taxpayer the equal protection of the law.

Without pursuing the subject further we are satisfied with the conclusion reached by the learned trial judge.

The judgment is, therefore, affirmed.

Hart, J., and Ellison, J., *pro tem.,* concurred.