[Civ. No. 11890.   First Dist., Div. One.   Apr. 1, 1942.]

OTTO C. KIESSIG et al., Appellants, v. COUNTY OF SAN DIEGO et al., Respondents.

Sloane & Steiner for Appellants.

James B. Abbey, District Attorney, and William A. Glen, Chief Deputy District Attorney, for Respondents.

GOODELL, J. pro tem.—On the first Monday in March, 1939, at noon, the appellants owned the "Sportfisher II" and the appellant Otto C. Kiessig owned the "Sportfisher III," both documented vessels registered in the Customs House at San Diego, their home port.  As of that time the respondent assessor levied a personal property tax for 1939-1940 against each vessel, $512.24 on one and $596.16 on the other.  Appellants paid the taxes under protest and brought this action for their refund.  Judgment went in favor of the county and this appeal ensued.

The protests were filed under the claim that each vessel was of more than 50 tons burden and therefore exempt under sec-

tion 4 of article XIII of the Constitution of this state, which reads: ''All vessels of more than fifty (50) tons burden registered at any port in this State and engaged in the transportation of freight or passengers, shall be exempt from taxation except for State purposes, until and including the first day of January, 1955.''

The court found that both vessels were engaged in the transportation of passengers; that as registered the deadweight tonnage of the ''Sportfisher II'' was in excess of 70 tons, her gross tonnage was 69.43, and her net 40 tons; that the deadweight tonnage of the ''Sportfisher III'' was in excess of 75 tons, her gross was 73.45, and her net 39 tons. The court then found that the former vessel did not exceed 40, or the latter 39, tons burden, and therefore that neither was exempt. It will be readily seen that if the size of these vessels should be determined by either their deadweight or their gross tonnage they are within the exemption.

The question to be decided is stated by appellants as follows: ''. . . was the trial court correct in adopting as the measure of the 'burden' of such vessels the respective 'net tonnages' thereof as registered in the United States Customs Office or should the tons burden thereof ·be measured in the ordinary sense of their respective 'carrying capacities'?'' In contending for a definition of ''tons burden'' in the ordinary sense the appellants invoke the familiar rule that ''. . . the courts will interpret a measure adopted by vote of the people in such manner as to give effect to the intent of the voters adopting it. (Cooley on Constitutional Limitations, [5th ed.], sec. 66.)'' (*Kaiser* v. *Hopkins*, 6 Cal. (2d) 537 [58 P. (2d) 1278].) In the last-cited case it is further said: ''It must be held that the voters judged of the amendment they were adopting by the meaning apparent on its face according to the general use of the words employed. Such is the rule where it does not appear that the words were used in a technical sense. . . . 'Where a word having a technical as well as a popular meaning is used in the Constitution, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the context suggests, that it is used in its technical sense.' '' Have the words ''tons burden'' a popular and non-technical meaning? Appellants ask the rhetorical question, ''What then is the popular signification of the word 'burden'? In searching for the answer, [they say] no better authority for 'ordinary and popular' meaning can be consulted than the dictionary'' and they quote

Webster's New International Dictionary as follows: "burden ... 1. That which is borne or carried; a load; ... 3. The bearing of loads; as, a ship or beast of *burden* ... 6. The capacity of a vessel, for carrying cargo;—also the weight of the cargo; as, a ship of a hundred tons *burden* ..." (Other dictionaries quoted are in agreement.) But this inquiry is not confined to the meaning of this word alone. We are concerned with the phrase, "more than fifty (50) tons burden," and if we resort to the dictionary cited by appellants we find that the first definition of the noun "ton" therein is equivocal for it shows (what everybody knows) that there are "long tons" or "gross tons" of 2,240 pounds, and "short tons" of 2,000 pounds, and two other kinds of tons as well. The second definition therein reads: "Naut. & Com. (a) A unit of internal capacity for ships; 100 cubic feet (2.8307 cu. m.); —called specif. *register ton*. See Tonnage, 2. (b) A unit approximately equal to the volume of a long ton weight of sea water, used in reckoning the displacement of vessels, esp. war vessels; 35 cubic feet;—called specif. *displacement ton*. (c) A unit of volume for freight, approximately the volume of a ton weight of the particular commodity;—called specif. *shipping ton*. A ton of merchandise is often reckoned at 40 cu. ft., and a ton of timber at 42 cu. ft." It might be noted, in passing, that the conclusion reached by the trial judge was not inconsistent with the dictionary definition in its nautical sense first quoted above. If, then, the voter, in pondering over the proposed constitutional amendment, had had recourse to his dictionary, the foregoing is what he would have found.

The words "tons burden" are not words in common use by the people generally, or by those who do not deal with ships and shipping. Each of them, taken separately, has its own ordinary meaning, and each is in common, every-day use, but when they are found in this collocation they form a phrase which is decidedly a shipping term. ■ "Technical words are interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense. This rule applies to words which are not in common use or which have no very definite signification in their ordinary use." (23 Cal. Jur. p. 750; 5 Cal. Jur. p. 596; sec. 1645, Civil Code.) ■ The Encyclopedia Britannica, 14th ed., vol. 20, pp. 555, 556, title "Shipping: Tonnage Terms," contains an elaborate review of this subject, too

lengthy to quote in full. However, the article opens with this statement: "The term 'Tonnage' has a variety of meanings. According to the British Merchant Shipping acts and the Suez and Panama Canal regulations it is a measurement of the capacity or volume of a ship expressed in units of 100 cubic feet—one unit of such volume being termed a ton measurement. The purpose of measuring a ship is twofold— primarily to form a basis for the payment of the various charges which are levied by Port and Harbour authorities, by Lighthouse Boards and for pilotage services; secondly for use in the registration or identification of the ship itself." In discussing gross and net tonnage after the method of measuring a vessel is given, this article says: "The register or net tonnage is now determinable (being the gross tonnage less the deductions permitted as described above), and is *the tonnage which appears on the register of the vessel and on which dues are assessed.*" (Emphasis ours.)

Thus far we have discussed only definitions of the words "ton" and "burden" found in the dictionary cited by appellants, and in the article in the Britannica which we consulted under section 1875, Code of Civil Procedure. From those authorities alone we are satisfied that the phrase "tons burden" is not one which can be said to be understandable without resort to a more technical inquiry than that afforded by the common lexicon.

The method of measuring vessels of American registry to determine their cargo capacity is minutely prescribed in R. S. 4153, codified in U. S. C. A., title 46, "Shipping," section 77 ("Tonnage") which reads in part as follows: "The register tonnage of every vessel built within the United States or owned by a citizen or citizens thereof shall be her entire internal cubical capacity in tons of one hundred cubic feet each, to be ascertained as follows:" Here follows a detailed and technical formula for the measurement of the gross tonnage of a vessel. The statute then provides for the deduction therefrom of the tonnage of spaces or compartments occupied by the crew, by the master, for the working of the helm, the capstan and anchor gear, for charts, signals, instruments, stores; also space occupied by the propelling power and numerous other spaces and areas. It then provides: "And the proper deduction from the gross tonnage having been made, the remainder shall be deemed the net or register tonnage of such vessels." In this legislation Congress has

provided for a more or less permanent record of net tonnage to be cut into the ship herself. This important requirement reads: "In every vessel documented as a vessel of the United States the number denoting her *net tonnage shall be deeply carved or otherwise permanently marked on her main beam, and shall be so continued; . . .*" with a penalty for violation. (Emphasis ours.) It is significant that this required memorial is of *net*, and not of gross or of deadweight tons.

It happens that in the instant case the appellants seek exemption on the claim that "tons burden" means *gross* tons or deadweight tons. If, however, the vessels were to go through the Panama Canal tolls would doubtless be charged on the basis of *net* register tonnage or its equivalent. (See U. S. C. A., title 48, "Insular Possessions," sec. 1315.) Likewise pilotage into or out of their home port would undoubtedly be computed on their *net* register tonnage. (Sec. 1376, Harb. & Nav. Code.)

A concise and informative statement respecting tonnage is found in *The Thomas Melville*, 62 Fed. 749 [10 C. C. A. 619], a case which had to determine whether wharfage charges were to be computed upon gross or upon net tonnage. An ordinance of the city of New Orleans, adopted in 1875 and amended in 1881, levied a charge of twenty cents per ton on vessels of "1,000 tons and under," (and a different rate for larger vessels), without specifying the kind of tons. The Circuit Court of Appeals held that the vessel should pay wharfage on the basis of gross, and not net, tonnage, for the reason that when the ordinance was adopted and amended "the navigation and customs laws of the United States dealt only with gross tonnage; and, at the same time, canal tolls in the state of Louisiana and general charges for towage and dock services were based upon gross tonnage." The court further pointed out that in 1882 the United States departed from its former practice of calculating customs dues upon gross tonnage "and adopted the practice of calculating customs and tonnage dues upon the net tonnage, which was to be determined according to certain rules laid down in the statute, and denominated the 'net register tonnage;' . . ." The court held that this change in federal law did not affect the New Orleans ordinance because nothing had been done locally to conform to the change. The case is not cited here for any bearing it might have as authority (it has none, because in the instant case there was no intervening change in

any law) but simply for the following clear definition of the word ''ton'' by a federal court of high authority passing upon a quasi-maritime question: ''2. The word 'ton,' in the ordinance and amendments thereto controlling this case, as applied to the measurement of vessels, has a certain definite meaning, well settled by custom and by the navigation laws of the United States, and it means 100 cubic feet of interior space. The entire cubic contents of the interior space, numbered in tons, is called the 'gross tonnage.' When, from the entire cubic contents of the interior of a vessel, there are deducted the spaces occupied by the crew and by propelling machinery, the remainder, numbered in tons, is called the 'net tonnage.' ''

Respondents cite *The Craigendoran*, 31 Fed. 87, where a statute of New York prescribed wharfage charges at one rate for vessels ''of two hundred tons burden and under,'' and a different rate for larger vessels (without specifying the kind of tons). The question (similar to that presented in the Melville case, *supra*) was whether the tonnage should be ascertained by measuring the vessel as prescribed by federal law in force when the state wharfage statute was enacted, in 1877, or by measuring her as prescribed by federal law in force when she was berthed. The court doubtless had in mind the change in 1882, noted in the Melville case. The district judge said: ''This question is not free from difficulty; but on reflection, and upon considering the force of the expression of the supreme court, where it is said, 'Evidently the word ''tonnage,'' in commercial designation, means the number of tons burden the ship will carry as estimated and ascertained by the official admeasurement and computation prescribed by the public authority,' and mindful of the fact that the measuring of a ship for the purpose of fixing her tonnage is required by law to be made by an officer of the United States, and that the method of measuring to be pursued by such officer is prescribed by law, and that the tonnage of the ship must be inserted in her register or enrollment, and the tonnage there stated must be that tonnage, and no other, which is ascertained by the officer, from a measurement made in the manner prescribed by law at the time of her registry or enrollment, and that consequently the only legal tonnage of the ship is the tonnage stated in her registry or enrollment, I am of the opinion that the words 'tons burden,' as used in the wharfage act of 1877, above quoted, should be held to

mean the registered tonnage of the ship, and not her gross tonnage. No method by which to ascertain the tonnage of a ship for the purpose of calculating her wharfage is provided by the state statute, and all ships are required by law to carry a register in which the tonnage is stated. The fair presumption is that it was the intention of the statute that reference to the ship's register should be made for the purpose of calculating her wharfage, and not to leave the tonnage to be a matter of private calculation and open to dispute.'' The reference to the decision of the Supreme Court is to the State Tonnage Tax Cases, 79 U. S. (12 Wall.) 204, 224 [20 L. Ed. 370]. The Melville case, *supra*, refers to The Craigendoran case as having been well decided. In *The Antonio Zambrana*, 88 Fed. 546, 548, the court says, citing The Craigendoran, ''It is probable that the rate should be upon the registered, and not gross, tonnage.''

In the case of ''The Brunel,'' Law Reports, Probate Division, 1900, p. 24, 48 Weekly Reporter, 243, 81 Law Times Report, 500, the Court of Appeal decided the precise question now presented. The opening sentence in the opinion reads: ''The question is, what is the meaning of the words 'not exceeding 15 tons burden' '' in the Merchant Shipping Act of 1894. Further, the court says, ''In the Court below it was argued that the meaning of tons burden in this section is 'the carrying capacity of the ship.' '' The Justice's views are thus stated: ''It seems to me that the true construction of this section, dealing with the registration and also with the nonregistration of a ship, is that the words 'tons burden' mean the net tonnage—that is, the gross tonnage after allowing for the deductions, in other words, the register tonnage.''

The appellants cite the case of *The North and South Shields Ferry Co.* v. *Barker*, Exchequer Reports, Vol. 2, p. 136. This case was decided in 1848, involving a small ferry across the river Tyne. It was decided before steam came into general use, and before the British Merchant Shipping Act of 1894, and it is not mentioned in The Brunel case. This is the only case the appellants cite which lends any support at all to their position.

Attention is called to the case of *County of Los Angeles* v. *Craig*, 38 Cal. App. (2d) 58 [100 P. (2d) 818], where this same section of the Constitution was before the court and where it was held that the word ''registered'' should be given its non-technical meaning. There was no question in that case

respecting the words "tons burden" for it was conceded that the vessel involved was of approximately 800 tons. The vessel had been "enrolled" as distinguished from "registered" (for the technical distinction between registration and enrollment see *The Mohawk*, 70 U. S. (3 Wall.) 566 [18 L. Ed. 67] ; *Wheaton* v. *Weston & Co.*, 128 Fed. 151) but the court held that when the word "registered" was used in the constitutional provision it was used in the same sense that it had theretofore been used in several legislative provisions where it was obviously used to include "enrolled" and "licensed."

One of the telling factors in this case is the requirement found in section 77 of the Shipping Act that the net tonnage of every registered vessel be carved into the very structure of the ship or otherwise permanently marked. This is a strong argument on the side of a definite tonnage, fixed and determined for long periods of time if not for the life of the ship, and not dependent upon how much she is capable of carrying "deadweight" or on how much cargo she carries on one voyage as distinguished from another—lead or feathers, for instance. Moreover, the view taken by the trial court is not at all contrary to the meaning given to "tons burden" when ordinary books of reference are consulted by laymen. They all show that the words "tons burden" when used together have a technical meaning, and connote a measurement peculiar to ships and shipping. We have seen from the statutes and from the cases cited that this meaning is *net register tonnage*, as the trial court held.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.