[Civ. No. 27320. First Dist., Div. One. Jan. 5, 1971.]

THOMAS L. PITTS et al., Plaintiffs and Respondents, v.
RONALD REAGAN, as Governor, etc., et al., Defendants and Appellants.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Edsel W. Haws and Paul M. Joseph, Deputy Attorneys General, for Defendants and Appellants.

Charles P. Scully and Donald C. Carroll for Plaintiffs and Respondents.

## OPINION

**ELKINGTON, J.**—The issues of this appeal relate to the effect of the third paragraph of article X, section 1 (formerly art. X, § 6, repealed 1960) of California's Constitution, hereafter referred to as "article X, section 1," on the state's practice under successive administrations of using con-

vict labor for harvesting privately owned crops during periods of alleged labor shortages.

Article X, section 1, directs: "The labor of convicts shall not be let out by contract to any person, copartnership, company or corporation, and the Legislature shall, by law, provide for the working of convicts for the benefit of the State."

It has been the practice in California, at least in some areas, for "local county prisoners" to aid in crop harvesting during periods when a farm labor shortage was believed to exist. The practice seems to have extended to a similar use of inmates of state prisons. In 1966 an average "work force of approximately 500" such prisoners was employed during certain harvest seasons. Again, as early as June 2, 1967, state officials were advised "that the situation in Stockton is such that the use of state prisoners is imminent." Thereafter, on September 27, 1967, the Governor announced by a press release that he had "authorized the use of prison labor in Merced County to assist in the harvest of figs and prevent a disastrous crop loss." The Governor stated, "I have been advised by the State Farm Labor Service that there is a critical need for workers to harvest Kadota Figs in Merced County. All normal sources of labor have been exhausted with the result that unless prison labor is made available immediately, a substantial loss will be suffered." The press release further stated that respondent "Thomas Pitts of the State AFL-CIO was advised of the action and was asked by the Administration to cooperate in meeting the emergency labor situation."

The State Director of Corrections then, by "Administrative Bulletin," announced that pursuant to Penal Code sections 6250-6254[1] he had established the "South Dorm" at the California Institute for Men at Chino and the "Field House" at Deuel Vocational Institution at Tracy as community correctional centers. This was followed by a resolution of the Adult Author-

---

[1]Penal Code section 6250: "The Director of Corrections may establish and operate facilities to be known as community correctional centers."

Penal Code section 6251: "The primary purpose of such facilities is to provide housing, supervision, counseling, and other correctional programs for persons committed to the Department of Corrections."

Penal Code section 6252: "The Director of Corrections shall make rules and regulations for the government of the community correctional centers in the management of their affairs."

Penal Code section 6253: "The Director of Corrections may transfer inmates whose terms of imprisonment have been fixed from the state prisons and facilities of the Department of Corrections to community correctional centers, and place parolees in the community correctional centers."

Penal Code section 6254: "The Director of Corrections may grant furloughs to residents of community correctional centers for the purpose of employment, education, including vocational training, or arranging a suitable employment and residence program."

ity which granted approval, until November 8, 1967, for the transfer of prisoners meeting certain "selection criteria" to the "community correctional centers" under the provisions of section 6253 of the California Penal Code.

The overall procedures taken were called the "Emergency Harvest Program." A "maximum" of 100 and 200 prisoners, respectively, were then transferred to the Chino and Deuel "community correctional centers" and released on "day furlough" for employment in the harvesting of grapes and figs. All of the prisoners so assigned volunteered for the work. At first they were selected without regard to whether they were eligible for parole. When it was discovered that such eligibility was legally required for placement in community correctional centers (Pen. Code, § 6253), the ineligible prisoners were transferred out of the program.

Each day the prisoners were bussed at the expense of the growers between their work and the community correctional centers. The salaries of guards accompanying the men were paid by the growers. Prevailing wages were paid for the work on a piece-work basis. These wages, however, were delivered to the state which retained a portion to cover "expenses incurred" and then placed the remainder in a fund to be held for the prisoners until their release. Among the "expenses incurred" by the state was a charge of $5 per day against each man for room and board. At Deuel the total wages paid to the state by the growers were $43,585; $23,463 of that amount was credited to the prisoners with the remainder retained by the state.

Neither the land nor the crops on which the prisoners worked were owned by the state. There were no individual contracts between the growers and the prisoners. Such contracts as existed were apparently oral, and were between the growers and state officials.

Within a few days after the program started the interested state officials were advised by respondent California Labor Federation that a farm workers union, upon certain conditions, was "willing, ready and able to supply all labor needs to replace convicts now working in the fields picking grapes and figs." Whether the union could perform is debated by the parties, but the tender apparently went unaccepted by the growers.

On October 3, 1967, when asked if he had plans to call out more prison labor for the harvesting of crops, the Governor replied, "Under the same circumstances, if needed to prevent a loss to the growers in California and eventually to the people in California through higher food prices, yes, we would."

On October 5, 1967, respondents filed an action against appellant state officials seeking to enjoin them from letting out by contract the labor of

convicts to any person, copartnership, company or corporation engaged in farming and the harvesting of crops in the State of California. After a hearing, by a decree for permanent injunction appellants were so enjoined. It is from this decree that the instant appeal was taken.

The first issue presented to us by the parties relates to the interpretation of the language of article X, section 1, reciting "The labor of convicts shall not be let out by contract to any person, copartnership, company or corporation, . . . ."

Appellants contend that this language does no more than prohibit the state "from *selling* the labor of inmates under contract or lease." (Italics added.) By this they apparently mean that the state may not, *for a consideration to itself,* sell or hire out convict labor to private persons or organizations. They seem to insist that the language "does not prohibit state officials from authorizing the employment of inmates" by private employers as long as the state does not profit thereby.

Both appellants and respondents recognize that where otherwise permitted by law, and to further his rehabilitation (e.g., Pen. Code, §§ 3056, 6254), a convict may himself sell or hire out his services to a private person, and that parole or other state officials may assist in such rehabilitative efforts. It seems equally agreed that the state may not let or hire out or sell convict labor to private entities for a consideration or profit running to the state. The question is narrowed to whether the state, without profit or consideration to itself, is permitted by article X, section 1, to furnish convict labor to private individuals or organizations under contract or other agreement.

The word "let" is defined as: "To allow to be used . . . for a compensation; . . . to hire out"; also "To permit; allow; suffer. . . ." It has been held to mean the correlative of the word "hire." (*Linnell* v. *State Dept. of Finance,* 203 Cal.App.2d 465, 468 [21 Cal.Rptr. 785].) As with "sale" the words "let" and "hire" clearly connote a consideration running from the recipient of the services or that which otherwise is let or hired or sold. The words may reasonably import an understanding that the consideration is to be delivered, or is due, to the owner of the subject goods or the person whose labor is let or hired. But just as often the usage is otherwise. One may let or hire or sell to another without himself having the right to the consideration. Thus a store clerk may be said to "sell" his employer's merchandise, or a real estate agent to "let" his principal's premises, or a theatrical agent to "hire" out the services of a client artist.

We have concluded that the instant language of article X, section

1, is intended in the broader sense—that the state may not let out convict labor by contract to private employers regardless of whether the state or the convicts or both receive the attendant consideration.

Our reasons:

■ Our conclusion is reasonably consistent with the natural and ordinary meaning of the words used—a result which should be sought in constitutional interpretation. (See *Kaiser* v. *Hopkins,* 6 Cal.2d 537, 538 [58 P.2d 1278]; *Hammond* v. *McDonald,* 49 Cal.App.2d 671, 684 [122 P.2d 332]; *County of Los Angeles* v. *Craig,* 38 Cal.App.2d 58, 61 [100 P.2d 818].)

Extended logically, appellants' argument demonstrates what we consider to be an unreasonable result. As long as the convicts ultimately receive their wages, perhaps years later, the state would be permitted without constitutional restraint to negotiate and contract with private employers for the use of convict labor in any commercial activity in the state. Little imagination is required to visualize the effects of convicts in this manner competing in the state's labor market. And there would seem little doubt that the terse words of article X, section 1, "The labor of convicts shall not be let out by contract" to private persons were not intended to allow such a practice.

■ The "conditions" of the present case—the consent of the convicts, the "going wages" paid, and the anticipated labor shortage—add no strength to appellants' contention; article X, section 1, authorizes no conditions under which its stricture is not binding.

■ We find further support for our conclusion in the proceedings and debates of the California Constitutional Convention of 1878-1879 (pp. 1034-1037), at which the substantially identical and predecessor section (art. X, § 6) to article X, section 1, was adopted. We recognize that such debates furnish a somewhat uncertain guide for constitutional interpretation. But where an ambiguity exists we may nevertheless "examine the debates which occurred at the time of the adoption of the part of the Constitution under analysis and learn from the statements of the Constitution-makers themselves, if possible, their purposes and intentions." (*Older* v. *Superior Court,* 157 Cal. 770, 776 [109 P. 478]; see also 11 Cal.Jur.2d (1953) Constitutional Law, §§ 45, 54, and authorities there cited.)

At the convention a motion was made to strike from the proposed article X, section 6, the words, "The labor of convicts shall not be let out by contract to any person, copartnership, company or corporation." The several delegates urging retention of this language argued "It is a burden upon free laborers for the State to contract the labor of these prisoners" (Delegate Condon); a very great evil is that "it brings this prison labor in competition with free white labor" (Delegate Freud); and "The interests of the laboring classes

are directly in conflict with the interest of those who employ contract labor" (Delegate Beerstecher). The proposed deletion was of course defeated.

It will be seen, at least as a rather strong probability, that the delegates, or at least the majority, were concerned with the abolition of contracted convict labor generally, not with abolishing it only when the contract price or wages were paid to and kept by the state.

██ Although unnecessary to our resolution of the appeal it is noted that the evidence would support a finding that part of the convicts' wages was in fact retained by the state and not credited to the convicts' accounts. As we have pointed out, the state deducted from these wages $5 per day per man for "room and board" which was furnished at Deuel and Chino prisons (as to Deuel, a near equivalent to a prison; see Pen. Code, §§ 2035-2042). Since the men were prisoners confined, even during the harvesting, in state prisons the state was under an obligation to maintain them. The room and board money reasonably represented some return to the state from the convict labor contracts. Thus, even accepting appellants' contention, *arguendo,* a constitutional violation nevertheless appears.

From the evidence which we have related, and appropriate findings reasonably based thereon, the superior court concluded that the complained of acts of appellants were violative of article X, section 1. For the reasons stated the conclusion was without error.

We advert now to the remaining contentions of appellants.

██ They contend that the Emergency Harvest Program was permitted under Penal Code sections 6250-6254 (see fn. 1, *ante*) relating to the establishment and operation of community correctional centers. They argue, "the primary purpose of these facilities is to provide housing, supervision, counseling, and other correctional programs for persons committed to the Department of Corrections. . . . The provisions authorizing community correctional centers and providing for work furlough rehabilitation programs demonstrate the present trend in penology to place primary emphasis upon the rehabilitation. The basic work furlough rehabilitation law is contained in section 1208 of the Penal Code. . . . In 1965, the Legislature, in adopting sections 6250-6255, extended the work furlough program to inmates of state institutions."

It is further pointed out by appellants that sections 6250-6254 were enacted under the authority of article X, section 1 (*first paragraph*), endowing the sections with constitutional dignity equal to that of article X, section 1 (*third paragraph*).

The superior court found that "the plan conceived and executed by the

defendants [appellants] does not resemble a rehabilitation program in any important respect" and concluded that "reliance of the defendants upon Penal Code sections 6250-6255 and section 1208 is misplaced and irrelevant inasmuch as the plan conceived and executed by the defendants does not conform in any material manner to the provisions of those sections."

We review the evidence on which these determinations were based. While the project took the form of a community correctional center activity, its sole purpose was to furnish convict labor to the private growers. Rehabilitative and counseling services (see Pen. Code, § 6251) may not reasonably be said to have been involved. Indeed, the purpose is well illustrated by the name given the activity by appellants themselves—the "Emergency Harvest Program." The men were not transferred from prison to community correctional centers as provided by section 6253; they continued to be prison inmates. They were at first selected without regard to their eligibility for community correctional center assignment (see Pen. Code, § 6253). And the program was designed to last only through the grape and fig harvest season.

It must be said that the superior court's determination that the program did "not conform in any material manner to the provisions" of sections 6250-6255, was supported by substantial evidence. (See *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

■ Appellants next argue that "There is nothing in the record to support the finding that respondents were damaged or would suffer irreparable harm by the employment of inmates" as was done in this case. We note that respondents represent substantially all of the labor unions of this state. Their interest in the subject contractual arrangements with private persons for convict labor was early recognized by appellants when "Thomas Pitts of the State AFL-CIO was advised of the action and was asked by the Administration to cooperate." Furthermore, as pointed out, there was some evidence, which presumably the trial judge believed, that union labor was available for use on the fig and grape crops. We cannot say that the criticized finding was without support of substantial evidence.

It is contended that "the saving of the fig and grape crops was in the public interest and a direct benefit to the state," and that the court's contrary finding "there was no benefit to the State" was therefore error. While it may be argued that any employment benefits the state since it adds in some degree to the overall material prosperity of its citizens, article X section 1, nevertheless, as we have pointed out, proscribes the type of convict employment here at issue.

Appellants' contention that the Emergency Harvest Program was author-

ized by the second clause of article X, section 1, ". . . the Legislature shall, by law, provide for the working of convicts for the benefit of the state" is without merit. The immediate argument here is that the legislatively authorized community correctional centers (Pen. Code, § 6250 et seq.) constituted such a provision. As we have pointed out, the trial court on substantial evidence found the program to constitute a letting out of convict labor by contract and not a legitimate community correctional center activity. A related contention is that the *second clause* of article X, section 1, does not restrict the state from permitting the contractual employment of prison inmates by private persons, but instead is addressed only to the state's right to convict labor. We may assume, *arguendo,* the premises which are urged; nevertheless, the *first clause* of the pertinent section does so restrict the state from allowing such employment under contract with private persons.

We note further that appellants do not rely in any way upon the World War II enactment of Penal Code sections 2800-2807 (Stats. 1945, ch. 35, pp. 346-349) in effect only during the wartime emergency. This statute, judicially untested, authorized convict "Employment in Farm Work and Fighting Fires." Its carefully chosen language (p. 347) authorized temporary removal of certain state prisoners who *themselves* "may contract with any person, firm, association or corporation, for the performance of labor in the producing or harvesting of crops." The issues here presented call for no determination of the effect of article X, section 1 (or the then § 6), on this wartime legislation.

Points raised in the final contention of error in the court's refusal to adopt certain findings offered by appellants have been covered in the earlier discussion of this opinion.

The decree for permanent injunction is affirmed.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied February 2, 1971, and appellants' petition for a hearing by the Supreme Court was denied March 3, 1971.