[Crim. No. 1598. Fifth Dist. Nov. 19, 1973.]

In re JOHN EMMETT QUINN et al. on Habeas Corpus.

474

[black redaction bars]

## COUNSEL

Chain, Younger, Cooney, Jameson & Lemucchi and Timothy Lemucchi for Petitioners.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Anthony L. Dicce and Leonard J. LaCasse, Deputy Attorneys General, for Respondent.

## OPINION

**JOY, J.[*]—**

### FACTS

On July 25, 1971, petitioners John Emmett Quinn and Thomas and Richard Quimette were fishing in the waters of the California Aqueduct from the Cadet Road bridge in Kern County. The bridge, which is without a sidewalk or other provision for pedestrians, is owned and maintained by the County of Kern. Erected on the bridge was a clearly visible sign which read "No Fishing or Loitering from Bridge." They were cited by Kern County Sheriff's deputies for violation of Kern County Ordinance No. 2605, which prohibits loitering or fishing on bridges in Kern County.[1]

---

[*]Assigned by the Chairman of the Judicial Council.

[1]Kern County Ordinance No. 2605 provides: "It shall be unlawful for any person or persons to fish from any bridge or parapeted culvert, or loiter upon, or at the approach thereto, or to obstruct or hinder or delay vehicular traffic upon any bridge or

Also on July 25, 1971, petitioners Patrick Warren Keefer, Robert Joseph Cloud, Harry Bennett Reynolds, and Gerald W. Underhill were fishing from the banks of the California Aqueduct in Kern County. While doing so, each was situated inside a portion of the canal bank which was closed off by a "Cyclone" or "common hogwire" fence. The fences were posted every 600 feet and at the intersection of all gates and bridges with "no trespassing" signs. Each of these petitioners was arrested for trespassing,[2] a violation of Penal Code section 555.

All of the petitioners were tried and convicted of their respective offenses in the municipal court at Bakersfield. They appealed to the

---

parapeted culvert, over any stream, creek, irrigation canal or slough in the County of Kern."

Kern County Ordinance No. 2606 provides: "The prohibition contained in Section 2605 is, and shall be, effective when appropriate signs giving notice thereof are erected upon the designated bridge or parapeted culvert by the Road Commissioner of Kern County who is hereby given authority to erect such signs."

Kern County Ordinance No. 2604 provides: "Any person or persons violating the provisions of this Chapter shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine not exceeding $100.00 or by imprisonment in the County Jail not exceeding 30 days, or by both such fine and imprisonment."

These petitioners do not contend that there was a failure of compliance by the county.

[2]Penal Code section 555 provides: "It is unlawful to enter or remain upon any posted property without the written permission of the owner, tenant, or occupant in legal possession or control thereof. Every person who enters or remains upon posted property without such written permission is guilty of a separate offense for each day during any portion of which he enters or remains upon such posted property."

Penal Code section 554 provides in pertinent part: "Any property, except that portion of such property to which the general public is accorded access, may be posted against trespassing and loitering in the manner provided in Section 554.1, and thereby become posted property subject to the provisions of this article applicable to posted property, if such property consists of, or is used, or is designed to be used, for any one or more of the following:

" . . . . . . . . . . . .

"(e) A water well, dam, reservoir, pumping plant, aqueduct, . . ."

Penal Code section 553 provides: "The following definitions apply to this article only:

"(a) 'Sign' means a sign not less than one (1) square foot in area and upon which in letters not less than two inches in height appear the words 'trespassing-loitering forbidden by law.'

"(b) 'Posted property' means any property specified in Section 554 which is posted in a manner provided in Section 554.1.

"(c) 'Posted boundary' means a line running from sign to sign and such line need not conform to the legal boundary or legal description of any lot, parcel, or acreage of land, but only the area within the posted boundary shall constitute posted property, except as otherwise provided in Section 554.1, subdivision (e)."

Except for their right to fish argument, these petitioners do not contend that the state-owned land upon which they were arrested is land which cannot be posted pursuant to section 554. Nor do they contend that the property was not properly posted in accordance with section 553.

Superior Court of Kern County, where the convictions were affirmed. An application to that court for certification to the Court of Appeal was denied. Petitioners now seek a writ of habeas corpus in this court.

At the trial there was no serious disagreement as to the facts. Each petitioner stipulated that he was fishing when arrested. All of the arrests occurred in the San Joaquin Field Division of the California Aqueduct. This division runs from Kettleman City, north of Kern County, to the Edmonston pump plant, 20 miles south of Mettler in the Tehachapi Mountains.

Received in evidence at trial was a series of title search booklets showing title to the section of the California Aqueduct in question, and the fenced area adjacent thereto, to be in the State of California. The chain of title disclosed that these lands were originally owned by the United States and were patented to the Southern Pacific Railway Company before being acquired by the State of California. Also received in evidence was a map of the Cadet Road bridge and a document showing title to the bridge to be in the County of Kern.

Evidence was adduced that the California Aqueduct in the area involved abounds with fish, including crappie, perch, catfish, striped bass, carp, and large and small-mouthed bass. It was also disclosed by the evidence that the nearest fishing streams are 40 miles from the area where petitioners were arrested.

In rebuttal it was developed through State Security Officer Montgomery that to his knowledge there were nine drownings last year in another field division where the California Aqueduct is not fenced (San Luis Field Division just north of the San Joaquin Field Division).

The principal issue in this case is whether or not fishing in the California Aqueduct is protected and reserved to the public by article I, section 25, of the California Constitution and related statutes.

## DISCUSSION

Article I, section 25, of the California Constitution provides: "The people shall have the right to fish upon and from the public lands of the State and in the waters thereof, excepting upon lands set aside for fish hatcheries, and no land owned by the State shall ever be sold or transferred without reserving in the people the absolute right to fish thereupon; and no law shall ever be passed making it a crime for the people to enter upon the public lands within this State for the purpose of fishing in any water containing fish that have been planted therein by the State;

provided, that the Legislature may by statute, provide for the season when and the conditions under which the different species of fish may be taken."

In discussing article I, section 25, it is stated in *Paladini* v. *Superior Court* (1918) 178 Cal. 369, at pages 371-372 [173 P. 588]: "The petitioners claim that by this section 'the people are given the constitutional right to fish in the navigable waters of the state.' If there were no such constitutional provision, petitioners state the rule thus: 'The fish belong to the people of the state of California. This is conceded. It must be so, that what they own, they may give away absolutely, or conditionally, with or without reservation.' The rule with reference to the private ownership of fish and game is thus stated in the late case of *In re Frank Phoedovius*, 177 Cal. 238, [170 Pac. 412]: Fish and game 'can only become the subject of ownership in a qualified way, and which can never be the subject of commerce except with the consent of the state and subject to conditions which it may deem best to impose for the public good.' (See, also, *Ex parte Bailey*, 155 Cal. 472, [132 Am.St.Rep. 95, 31 L.R.A. (N.S.) 534, 101 Pac. 441]; *Ex parte Fritz*, 86 Miss. 210, [109 Am.St.Rep. 700, 38 South. 722]; *Ex parte Kenneke*, 136 Cal. 527, [89 Am.St.Rep. 177, 69 Pac. 261].) It is, therefore, evident that what the people of the state own they can alienate on such terms as they choose to impose, and that this power of regulation continues so long as such fish or game are the subject of trade or transfer. This legislative power was in no wise modified by the addition of section 25, article I (*supra*), to the constitution. It is apparent that the principal purpose of this amendment, as stated in the *Matter of Application of Parra*, 24 Cal.App. 339, [141 Pac. 393], 'was to preserve to the people the right to fish upon the public lands of the state, and to require that grants of land by the state should not be made "without reserving to the people the absolute right to fish thereon." ' The proviso in the section authorizing the legislature to fix 'the season when and the conditions under which the different species of fish may be taken' was evidently intended to leave the matter exactly as it was before the adoption of this amendment in November, 1910, except as it restricted the power to alienate public land without such reservation, or to create private fisheries thereon. This section gave no right to the people which they did not already have."

We first consider the petitions of Quinn and Thomas and Richard Quimette who were convicted of fishing from the Cadet Road bridge in violation of a Kern County ordinance.

■ Article I, section 25 of the California Constitution is concerned

with "public lands of the State." County-owned property, such as the bridge, is not "public lands of the State," nor is it "public lands within this State," as those terms are used in article I, section 25 of the Constitution. (See *Paladini* v. *Superior Court, supra,* 178 Cal. 369; *Matter of Application of Parra* (1914) 24 Cal.App. 339 [141 P. 393].) The constitutional right to fish does not protect those fishing from county-owned property.

Furthermore, a county, within its limits, may make and enforce by ordinance police regulations not in conflict with the general laws. (Cal. Const., art. XI, § 7.) The Legislature has delegated the management and control of the bridge here involved to the County of Kern (Sts. & Hy. Code, § 1321) and has delegated to the county the right to adopt ordinances regulating vehicular and pedestrian traffic upon the bridge. (Veh. Code, § 21109.) (See *Ham* v. *County of Los Angeles* (1920) 46 Cal. App. 148, 155-157 [189 P. 462].) The county ordinance involved herein is a reasonable and proper exercise of the police power since it is designed to preserve and protect the safety and welfare of both pedestrians and persons traveling over the bridge in motor vehicles. See *Ham* v. *County of Los Angeles, supra.* Accordingly, we conclude that the arrests and conviction of petitioners Quinn and Thomas and Richard Quimette did not violate article I, section 25 of the California Constitution.

We next consider whether or not the arrests and conviction of petitioners Keefer, Cloud, Reynolds and Underhill for violation of Penal Code section 555 violated article I, section 25.

The People rely in part on an opinion of the Attorney General (22 Ops.Cal.Atty.Gen. 134 (1953))[3] to sustain their contention that the

[3] 22 Ops.Cal.Atty.Gen. at page 135 states: "The phrase 'public lands' does not include all land owned by the Federal Government or the State. It is habitually used to describe those lands of the Federal Government or the State which are subject to sale or disposal under general laws and are not held back or reserved for any specific governmental or public purpose (*Northern Pacific R. Co.* v. *Musser-Sauntry Co.,* 168 U.S. 604; *United States* v. *Southern Pacific R. Co.,* 146 U.S. 570; *Newhall* v. *Sanger,* 92 U.S. 761; see also, Public Lands, 73 C.J.S. 647). The meaning of the term may vary with its context (*Union Pacific R. Co.* v. *Karges,* 169 Fed. 459; *United States* v. *Blendaur,* 128 Fed. 910). The general rule, however, is that laws dealing with public lands do not embrace real estate acquired or held by the State for special governmental purposes (*Oklahoma* v. *Texas,* 258 U.S. 574; *Northern Pacific R. Co.* v. *Musser-Sauntry Co., supra; United States* v. *Southern Pacific R. Co., supra; Lund* v. *Nichols* (Okla.), 57 P.2d 592). Such is the rule in California (*McNeil* v. *Kingsbury,* 190 Cal. 406, 410).

"Again, the courts have held that land to which any private claim or right has legally attached is not public land. [Citations.]"

This opinion expressly overrules an earlier unpublished Attorney General's opinion (NS-3679) which is relied on in part by petitioners.

conviction of these petitioners did not violate petitioners' rights under article I, section 25. This opinion concludes that the term "public lands" as used in this provision has been thoroughly defined so as to exclude land acquired for special governmental purposes, such as the aqueduct.

■ Opinions of the Attorney General are not binding on this court. They are, however, entitled to serious consideration where no clear case authority exists. (*Smith* v. *Anderson* (1967) 67 Cal.2d 635, 641, fn. 5 [63 Cal.Rptr. 391, 433 P.2d 183]; *People* v. *Shearer* (1866) 30 Cal. 645, 652-653.) In our view, the opinion of the Attorney General in 22 Ops.Cal. Atty.Gen. 134 fails to take into consideration certain well settled rules of interpretation of constitutional provisions and is thus not persuasive here.

We are concerned with the first and third clauses of article I, section 25 and must determine the interpretation to be accorded to these clauses.

The first clause of article I, section 25, gives to the people the right to fish upon and from the public lands of the state and in the waters thereof, excepting therefrom certain lands not relevant here. The third clause provides that no law shall be passed making it a crime for the people to enter upon the public lands within the state for the purpose of fishing in any water containing fish that have been planted *therein* by the state. The latter clause is a restriction on the powers of the state. (See *Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811].)

■ Constitutional provisions must be construed to give full force and effect to every portion thereof. It is the legal intendment that each and every clause has been inserted for a useful purpose and when rightly understood has some practical operation. (*Smith* v. *State Board of Control* (1932) 215 Cal. 421 [10 P.2d 736]; *People* v. *Lynch* (1875) 51 Cal. 15; *Helping Hand Home* v. *San Diego* (1938) 26 Cal.App.2d 452 [79 P.2d 778]; *People* v. *Zolotoff* (1941) 48 Cal.App.2d 360 [119 P.2d 745].)
■ Furthermore, a constitutional amendment should be construed in accordance with the natural and ordinary meaning of the words as generally understood at the time of its enactment. (*Ex parte Anderson* (1901) 134 Cal. 69, 74 [66 P. 194]; *Pitts* v. *Reagan* (1971) 14 Cal. App.3d 112 [92 Cal.Rptr. 27]; *County of Los Angeles* v. *Craig* (1940) 38 Cal.App.2d 58 [100 P.2d 818]; *McMillan* v. *Siemon* (1940) 36 Cal. App.2d 721 [98 P.2d 790].) Accordingly, where it does not appear that words used in a constitutional amendment were used in a technical sense, the voters must be deemed to have construed the amendment by the meaning apparent on its face according to the general use of the words employed. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537 [58 P.2d 1278]; *Vandegrift* v. *Board of Supervisors* (1972) 23 Cal.App.3d 228 [100 Cal.

Rptr. 87]; *San Francisco* v. *McGovern* (1915) 28 Cal.App. 491 [152 P. 980].) ▆ Technical words in a constitution are interpreted as usually understood by persons in the business or profession to which they relate, unless clearly used in a different sense. The rule on interpretation of technical words applies to words that are not in common use and have no very definite signification in ordinary use. (*Kiessig* v. *County of San Diego* (1942) 51 Cal.App.2d 47 [124 P.2d 163]; *Oakland Paving Co.* v. *Hilton* (1886) 69 Cal. 479 [11 P. 3].) In the absence of definition of words in the Constitution, words having no technical meaning will be taken in their ordinary and generally accepted sense. (*Hammond* v. *McDonald* (1942) 49 Cal.App.2d 671, 684 [122 P.2d 332].)

▆ The courts must interpret a constitutional amendment to give effect to the intent of the voters adopting it. (*Kaiser* v. *Hopkins, supra,* 6 Cal.2d 537.) The argument submitted to the electors in support of a proposed constitutional amendment is not controlling but may be resorted to as an aid in determining the intention of the framers and the electorate. (*Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179 [93 P.2d 140]; *People* v. *Ottey* (1936) 5 Cal.2d 714, 723 [56 P.2d 193]; *Cal. Inst. of Technology* v. *Johnson* (1942) 55 Cal.App.2d 856 [132 P.2d 61].)

▆ New provisions of the Constitution must be considered with reference to the situation intended to be remedied or provided for. (*Turlock Irr. Dist.* v. *White* (1921) 186 Cal. 183, 188 [198 P. 1060, 17 A.L.R. 72] (disapproved on other grounds, *Rock Creek etc. Dist.* v. *County of Calaveras* (1946) 29 Cal.2d 7, 12 [172 P.2d 863]); *Story* v. *Richardson* (1921) 186 Cal. 162 [198 P. 1057, 18 A.L.R. 750]; *People* v. *Zolotoff* (1941) 48 Cal.App.2d 360 [119 P.2d 745]; *McMillan* v. *Siemon, supra,* 36 Cal.App.2d 721.)

The appellate courts, in construing the limitation fixed by an amendment to the Constitution, have the power to take judicial cognizance of the existence of the evil which the Legislature in framing such amendment, and the people ratifying it, endeavored to correct. (*Hilborn* v. *Nye* (1911) 15 Cal.App. 298, 304 [114 P. 801].)

We must determine what the words "public lands" as used in the first and third clauses of article I, section 25, were intended to mean by the framers of the amendment and the electors who adopted it in 1910.

In determining the meaning to be ascribed to the words "public lands" in article I, section 25, we must be guided by the settled rules for interpretation of constitutional provisions.

The words "public lands" as used in article I, section 25, are not defined

in the Constitution. We find that these words are not technical words used in a technical sense. (*Hammond* v. *McDonald, supra,* 49 Cal.App.2d 671; *Kiessig* v. *County of San Diego, supra,* 51 Cal.App.2d 47.) The words "public lands" must be construed in accordance with the natural and ordinary meaning of the words as generally understood at the time of the adoption of article I, section 25, in 1910.

It seems clear that the framers and electorate in 1910 did not conceive of waters such as those now flowing through the California Aqueduct. Such waters and state-acquired lands immediately adjacent thereto were not in the contemplation of the framers or the electorate when article I, section 25, was adopted. (See argument in favor of art. I, § 25.)[4]

From the argument to the voters (fn. 4) it clearly appears that the framers and the electors had in mind the inland streams and the coast waters of the State of California and the public lands which made such waters accessible to them for the purpose of taking fish.

"The first step in the application and interpretation of an amendment to

[4]"Reasons Why Assembly Constitutional Amendment No. 14 Should Be Favorably Voted Upon by the People of California.

"The inland streams and coast waters of the State of California abound in a great variety of fish, and aside from the sport of taking them, they furnish a very large portion of the state's free food supply. That the fish may not be exterminated and this great item of popular food depleted the people of the state are spending large sums annually for its protection and propagation.

"For many years the people of California have enjoyed the right to take fish from the waters of the state pretty generally, but since the vigorous development of California's natural resources by individuals and large corporations, many of the streams have been closed to the public and trespass notices warning the public not to fish are displayed to an alarming extent.

"The people are paying for the protection and propagation of the fish; for this reason if for no other they should have the right to take them. It is not fair that a few should enjoy the right to take the fish that all the people are paying to protect and propagate.

"To reserve the right to fish in a portion of the waters of the state at least, for the people, Assembly Constitutional Amendment No. 14 was introduced and adopted at the last session of the legislature of the State of California, and as an evidence of its popularity it was unanimously adopted by the assembly and by the senate with but two dissenting votes.

"If the people of the state vote favorably upon this proposed amendment to the constitution it will give them the right to fish upon and from the public lands of the state and in the waters thereof, and will prevent the state from disposing of any of the lands it now owns or what it may hereafter acquire without reserving in the people the right to fish.

"W. J. COSTAR, Chairman Assembly
Committee on Fish and Game,
Thirty-eighth Session."

(The court has taken judicial notice of the foregoing argument to the voters under Evidence Code section 450 et seq.)

a constitution or statute is to consider the conditions existing prior to its adoption, so as to ascertain its objects and purposes." (*Matter of Russell* (1912) 163 Cal. 668, 672 [126 P. 875], revd. on other grounds, *sub nom. Russell* v. *Sebastian* (1914) 233 U.S. 195 [58 L.Ed. 912, 34 S.Ct. 517]; see also *Robertson* v. *Langford* (1928) 95 Cal.App. 414, 424 [273 P. 150].)

The argument to the voters (fn. 4, *supra*) stated that for many years the public had enjoyed the right to take fish from the inland streams and coastal waters "pretty generally." However, after the commencement of vigorous development of California's natural resources by individuals and large corporations, many streams were closed to the public and trespass notices warning the public not to fish were displayed to an alarming extent. The framers and voters were aware that the people were paying for the protection and propagation of the fish and for this reason the people should be able to take them. The people were further aware that a few were enjoying the right to take fish that all of the people were paying for, and that this was not fair. These were the evils intended to be remedied by the addition of article I, section 25. (*People v. Zolotoff, supra,* 48 Cal.App.2d 360.)

The argument to the voters further stated that to reserve the right to fish in a portion of the waters of the state was the reason the amendment was proposed.

We must conclude that the words "public lands" as used in Article I, section 25, were intended by the framers and voters in 1910 to mean public lands which provided access to fish in the inland streams and coastal waters of the state. The people had a reasonable expectation that such lands should be open to the public for their use for the purpose of fishing.

We hold that it was not in the contemplation of the electors or the framers of the amendment, nor their intention, that they have the unrestricted right to go upon all state-owned property to fish. The right of the state to exclude the public from certain state-owned lands used or acquired for special state purposes is essential for the state to govern effectively for the general welfare of the people and must exist where such right is not specifically restricted by constitutional provisions. Examples of such state-owned lands are lands such as those used for prisons, mental institutions,[5] military and police installations and other special state uses. The framers and electors did not contemplate in 1910, nor did they intend, that "public lands" as used in article I, section 25, include property

---

[5]*McNeil* v. *Kingsbury* (1923) 190 Cal. 406, 410-411 [213 P. 50].

acquired or used by the state for special governmental purposes, such as the California Aqueduct.

For the foregoing reasons we conclude that the conviction of these petitioners for violation of Penal Code section 555 does not conflict with article I, section 25, of the Constitution.

In the particular circumstances before us here, there is another valid reason why the conviction of these petitioners does not violate the Constitution. We are dealing here with a man-made cement aqueduct. This aqueduct is a danger to the lives and safety of persons going in or near it. Undisputed evidence elicited at the trial of these petitioners showed that there were nine drownings last year in another field division (just north of the San Joaquin Field Division) which was not fenced and posted.

■ The California Constitution is a restriction upon the powers of the state. The Legislature has any power it chooses to exercise unless it is restricted by the federal or state Constitution. (*Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811]; *Delaney* v. *Lowery* (1944) 25 Cal.2d 561 [154 P.2d 674]; *Fitts* v. *Superior Court* (1936) 6 Cal.2d 230 [57 P.2d 510].)

■ The first clause of article I, section 25, gives to the people the right to fish upon and from the public lands and in the waters thereof. This clause does not purport to restrict the state from the reasonable exercise of its police power in the interest of the public safety and welfare.

■ The police power is the power to govern. It is the inherent, reserved power of the state to subject individual rights to reasonable regulation in the interest of the general welfare. (*El Paso* v. *Simmons* (1965) 379 U.S. 497, 508 [13 L.Ed.2d 446, 454, 85 S.Ct. 577]; *Goldblatt* v. *Hempstead* (1962) 369 U.S. 590 [8 L.Ed.2d 130, 82 S.Ct. 987]; *Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98]; *Nebbia* v. *New York* (1934) 291 U.S. 502 [78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469]; *Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686 [151 P. 398].)

The state has the sovereign right to protect its citizens and has wide discretion when it exercises its police power for this purpose. The existence of the police power imposes upon the state the duty to take adequate steps to protect the lives of its residents. (*Ingram* v. *Colgan* (1895) 106 Cal. 113, 122 [39 P. 437]; *Chavez* v. *Municipal Court* (1967) 256 Cal.App.2d 149, 153 [64 Cal.Rptr. 76]; *DeAryan* v. *Butler* (1953) 119 Cal.App.2d 674 [260 P.2d 98].)

The state has a vital interest in restricting access to the California Aqueduct where the same is fenced in the San Joaquin Field Division. This interest is to keep people and animals from drowning in the aqueduct, to save the state from possible liability for children and others drowning or sustaining other injuries in the aqueduct until safe areas for fishing can be erected, and to protect state property from possible damage. (See *Cardenas* v. *Turlock Irrigation Dist.* (1968) 267 Cal.App.2d 352, 356 [73 Cal.Rptr. 69]; *Hibbs* v. *Los Angeles County Flood Control Dist.* (1967) 252 Cal.App.2d 166, 169 [60 Cal.Rptr. 364].)

 We conclude that the fencing and posting of the area adjacent to the California Aqueduct is a reasonable and proper use of the police power under the particular facts before us in this case to protect the lives, safety and welfare of the citizens of the state, to protect the state from possible liability and to protect its property from possible damage.

 These petitioners next contend that they were protected from arrest and conviction by the provision of article I, section 25, which provides: "no law shall ever be passed making it a crime for the people to enter upon the public lands within this State for the purpose of fishing in any water containing fish that have been planted *therein* by the State. . . ." (Italics added.) They argue that since almost all fish to be found in the inland waters of the state have been planted by the state at one time or another, this clause affords them protection. This clause is a restriction upon the powers of the state. (*Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811]; *Delaney* v. *Lowery* (1944) 25 Cal.2d 561 [154 P.2d 674]; *Fitts* v. *Superior Court* (1936) 6 Cal.2d 230 [57 P.2d 510].) These words are also to be interpreted in their ordinary meaning in order to give effect to the intent of the voters. (*Kaiser* v. *Hopkins, supra,* 6 Cal.2d 537.) Since fish have not been deliberately planted in the aqueduct at the expense of the taxpayers, and since no small group of people is unfairly enjoying the right to take fish that all the people are paying to protect and propagate, we conclude that by adopting this provision the voters did not intend to restrict the power of the state to prohibit the people from entering upon state-owned lands, used for special governmental purposes, to fish in waters in which fish were not planted by the state.

The limitations or restrictions contained in the Constitution are to be construed strictly and are not to be extended to include matters not covered by the language used. (*Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169].)

 Finally, all petitioners contend that sections 11900 and 11901 of the Water Code declare that it is necessary for the public health and welfare that water projects in the state be constructed in a manner consistent with the full utilization of their enhancement of fish and wildlife and to meet recreational needs. This declared policy of the Legislature is not disputed, nor do we dispute that fishing is one of the activities to be provided for in water projects. However, this declared policy does not render unconstitutional the conviction of the petitioners.

Water Code section 11922 provides: "The Legislature finds and declares that due to insufficient funds recreation and fish and wildlife enhancement facilities of state water projects are generally inadequate to accommodate the demands made upon them at the present time and will become critically inadequate as time progresses and that this condition is not in accordance with the policy of the Legislature as set forth in Sections 11900 and 11901."

Section 11920 of the Water Code, dealing with public fishing access sites, provides: "The Wildlife Conservation Board is authorized to design and construct public fishing access sites to aqueducts constructed as part of state water projects in accordance with such policies and procedures as may be established by the board.

*"To the extent practicable such fishing access sites shall be constructed upon lands acquired for state water project purposes; provided, that such additional lands as may be necessary for such fishing access sites shall be acquired by the Department of Water Resources pursuant to this chapter; and, provided further, that such facilities as may be necessary to assure the safe use of such fishing access sites by the public shall be constructed by the Department of Water Resources upon the appropriation of funds for such purposes by the Legislature."* (Italics added.)

This section makes it clear that the Legislature intends, when funds are available, to provide for the construction of fishing access sites to the extent practicable. It further makes it clear that such facilities as may be necessary to assure the safe use of such fishing access sites shall be constructed when the Legislature appropriates funds for such purpose. The petitioners made no showing that an appropriation of funds for such fishing sites at the place of their arrests has ever been made. These provisions of the Water Code do not render the conviction of petitioners unconstitutional. Rather, these sections merely declare a policy and do not purport to accord any fishing rights to the public until funds are appropriated by the Legislature and safe fishing access sites are constructed by the state to the extent practicable.

## CONCLUSION

Petitioners' contention that their convictions violated article I, section 25, of the Constitution and related statutes is without merit.

We conclude that the petition of John Emmett Quinn, Thomas and Richard Quimette, Patrick Warren Keefer, Robert Joseph Cloud, Harry Bennett Reynolds and Gerald W. Underhill for a writ of habeas corpus must be and the same is hereby denied.

Gargano, Acting P. J., and Franson, J., concurred.